Justice GINSBURG delivered the opinion of the Court.
When a criminal conviction is invalidated by a reviewing court and no retrial will occur, is the State obliged to refund fees, court costs, and restitution exacted from the defendant upon, and as a consequence of, the conviction? Our answer is yes. Absent conviction of a crime, one is presumed innocent. Under the Colorado law before us in these cases, however, the State retains conviction-related assessments unless and until the prevailing defendant institutes a discrete civil proceeding and proves her innocence by clear and convincing evidence. This scheme, we hold, offends the Fourteenth Amendment's guarantee of due process.
I
A
Two cases are before us for review. Petitioner Shannon Nelson, in 2006, was convicted *1253 by a Colorado jury of five counts-two felonies and three misdemeanors-arising from the alleged sexual and physical abuse of her four children. 362 P.3d 1070, 1071 (Colo.2015) ; App. 25-26. The trial court imposed a prison sentence of 20 years to life and ordered Nelson to pay court costs, fees, and restitution totaling $8,192.50. 362 P.3d, at 1071. On appeal, Nelson's conviction was reversed for trial error. Ibid. On retrial, a new jury acquitted Nelson of all charges. Ibid.
Petitioner Louis Alonzo Madden, in 2005, was convicted by a Colorado jury of attempting to patronize a prostituted child and attempted third-degree sexual assault by force. See 364 P.3d 866, 867 (Colo.2015). The trial court imposed an indeterminate prison sentence and ordered Madden to pay costs, fees, and restitution totaling $4,413.00. Ibid. The Colorado Supreme Court reversed one of Madden's convictions on direct review, and a postconviction court vacated the other. Ibid. The State elected not to appeal or retry the case. Ibid.
Between Nelson's conviction and acquittal, the Colorado Department of Corrections withheld $702.10 from her inmate account, $287.50 of which went to costs and fees[1] and $414.60 to restitution. See 362 P.3d, at 1071, and n. 1. Following Madden's conviction, Madden paid Colorado $1,977.75, $1,220 of which went to costs and fees[2] and $757.75 to restitution. See 364 P.3d, at 867. The sole legal basis for these assessments was the fact of Nelson's and Madden's convictions.[3] Absent those convictions, Colorado would have no legal right to exact and retain petitioners' funds.
Their convictions invalidated, both petitioners moved for return of the amounts Colorado had taken from them. In Nelson's case, the trial court denied the motion outright. 362 P.3d, at 1071. In Madden's case, the postconviction court allowed the refund of costs and fees, but not restitution. 364 P.3d, at 867-868.
The same Colorado Court of Appeals panel heard both cases and concluded that Nelson and Madden were entitled to seek refunds of all they had paid, including amounts allocated to restitution. See People v. Nelson, 369 P.3d 625, 628-629 (2013) ; People v. Madden, --- P.3d ----, ----, 2013 WL 1760869, *1 (Apr. 25, 2013). Costs, fees, and restitution, the court held, must be "tied to a valid conviction," 369 P.3d, at 627-628, absent which a court must "retur[n] the defendant to the status quo ante," - -- P.3d at ----, 2013 WL 1760869, at *2.
*1254 The Colorado Supreme Court reversed in both cases. A court must have statutory authority to issue a refund, that court stated. 362 P.3d, at 1077, 364 P.3d, at 868. Colorado's Compensation for Certain Exonerated Persons statute (Exoneration Act or Act), Colo.Rev.Stat. §§ 13-65-101, 13-65-102, 13-65-103 (2016), passed in 2013, "provides the proper procedure for seeking a refund," the court ruled. 362 P.3d, at 1075, 1077. As no other statute addresses refunds, the court concluded that the Exoneration Act is the "exclusive process for exonerated defendants seeking a refund of costs, fees, and restitution." Id., at 1078.[4] Because neither Nelson nor Madden had filed a claim under the Act, the court further determined, their trial courts lacked authority to order a refund. Id., at 1075, 1078 ; 364 P.3d, at 867.[5] There was no due process problem, the court continued, because the Act "provides sufficient process for defendants to seek refunds of costs, fees, and restitution that they paid in connection with their conviction." 362 P.3d, at 1078.
Justice Hood dissented in both cases. Because neither petitioner has been validly convicted, he explained, each must be presumed innocent. Id., at 1079 (Nelson ); 364 P.3d, at 870 (adopting his reasoning from Nelson in Madden ). Due process therefore requires some mechanism "for the return of a defendant's money," Justice Hood maintained, 362 P.3d, at 1080 ; as the Exoneration Act required petitioners to prove their innocence, the Act, he concluded, did not supply the remedy due process demands, id., at 1081. We granted certiorari. 579 U.S. ----, 137 S.Ct. 30, 195 L.Ed.2d 902 (2016).
B
The Exoneration Act provides a civil claim for relief "to compensate an innocent person who was wrongly convicted." 362 P.3d, at 1075. Recovery under the Act is available only to a defendant who has served all or part of a term of incarceration pursuant to a felony conviction, and whose conviction has been overturned for reasons other than insufficiency of evidence or legal error unrelated to actual innocence. See § 13-65-102. To succeed on an Exoneration Act claim, a petitioner must show, by clear and convincing evidence, her actual innocence of the offense of conviction. §§ 13-65-101(1), 13-65-102(1). A successful petitioner may recoup, in addition to compensation for time served,[6] "any fine, penalty, court costs, or restitution ... paid ... as a result of his or her wrongful conviction." Id., at 1075 (quoting § 13-65-103(2)(e)(V) ).
*1255 Under Colorado's legislation, as just recounted, a defendant must prove her innocence by clear and convincing evidence to obtain the refund of costs, fees, and restitution paid pursuant to an invalid conviction. That scheme, we hold, does not comport with due process. Accordingly, we reverse the judgment of the Supreme Court of Colorado.
II
The familiar procedural due process inspection instructed by Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), governs these cases. Colorado argues that we should instead apply the standard from Medina v. California, 505 U.S. 437, 445, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992), and inquire whether Nelson and Madden were exposed to a procedure offensive to a fundamental principle of justice. Medina "provide[s] the appropriate framework for assessing the validity of state procedural rules" that "are part of the criminal process." Id., at 443, 112 S.Ct. 2572. Such rules concern, for example, the allocation of burdens of proof and the type of evidence qualifying as admissible.[7] These cases, in contrast, concern the continuing deprivation of property after a conviction has been reversed or vacated, with no prospect of reprosecution. See Kaley v. United States, 571 U.S. ----, ----, n. 4, 134 S.Ct. 1090, 1110 n. 4, 188 L.Ed.2d 46 (2014) (ROBERTS, C.J., dissenting) (explaining the different offices of Mathews and Medina ). Because no further criminal process is implicated, Mathews "provides the relevant inquiry." 571 U.S., at ---- n. 4, 134 S.Ct., at 1110 n. 4.
III
Under the Mathews balancing test, a court evaluates (A) the private interest affected; (B) the risk of erroneous deprivation of that interest through the procedures used; and (C) the governmental interest at stake. 424 U.S., at 335, 96 S.Ct. 893. All three considerations weigh decisively against Colorado's scheme.
A
Nelson and Madden have an obvious interest in regaining the money they paid to Colorado. Colorado urges, however, that the funds belong to the State because Nelson's and Madden's convictions were in place when the funds were taken. Tr. of Oral Arg. 29-31. But once those convictions were erased, the presumption of their innocence was restored. See, e.g., Johnson v. Mississippi, 486 U.S. 578, 585, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) (After a "conviction has been reversed, unless and until [the defendant] should be retried, he must be presumed innocent of that charge.").[8] "[A]xiomatic and elementary,"
*1256 the presumption of innocence "lies at the foundation of our criminal law." Coffin v. United States, 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481 (1895).[9] Colorado may not retain funds taken from Nelson and Madden solely because of their now-invalidated convictions, see supra, at 1253 - 1254, and n. 3, for Colorado may not presume a person, adjudged guilty of no crime, nonetheless guilty enough for monetary exactions.[10]
That petitioners prevailed on subsequent review rather than in the first instance, moreover, should be inconsequential. Suppose a trial judge grants a motion to set aside a guilty verdict for want of sufficient evidence. In that event, the defendant pays no costs, fees, or restitution. Now suppose the trial court enters judgment on a guilty verdict, ordering cost, fee, and restitution payments by reason of the conviction, but the appeals court upsets the conviction for evidentiary insufficiency. By what right does the State retain the amount paid out by the defendant? "[I]t should make no difference that the reviewing court, rather than the trial court, determined the evidence to be insufficient." Burks v. United States, 437 U.S. 1, 11, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). The vulnerability of the State's argument that it can keep the amounts exacted so long as it prevailed in the court of first instance is more apparent still if we assume a case in which the sole penalty is a fine. On Colorado's reasoning, an appeal would leave the defendant emptyhanded; regardless of the outcome of an appeal, the State would have no refund obligation. See Tr. of Oral Arg. 41, 44.[11]
B
Is there a risk of erroneous deprivation of defendants' interest in return of their funds if, as Colorado urges, the Exoneration Act is the exclusive remedy? Indeed yes, for the Act conditions refund on defendants' proof of innocence by clear and convincing evidence. § 13-65-101(1)(a). But to get their money back, defendants should not be saddled with any proof burden. Instead, as explained supra, at 1255 - 1256, they are entitled to be presumed innocent.
*1257 Furthermore, as Justice Hood noted in dissent, the Act provides no remedy at all for any assessments tied to invalid misdemeanor convictions ( Nelson had three). 362 P.3d, at 1081, n. 1 ; see § 13-65-102(1)(a). And when amounts a defendant seeks to recoup are not large, as is true in Nelson's and Madden's cases, see supra, at 1253, the cost of mounting a claim under the Exoneration Act and retaining a lawyer to pursue it would be prohibitive.[12]
Colorado argued on brief that if the Exoneration Act provides sufficient process to compensate a defendant for the loss of her liberty, the Act should also suffice "when a defendant seeks compensation for the less significant deprivation of monetary assessments paid pursuant to a conviction that is later overturned." Brief for Respondent 40. The comparison is inapt. Nelson and Madden seek restoration of funds they paid to the State, not compensation for temporary deprivation of those funds. Petitioners seek only their money back, not interest on those funds for the period the funds were in the State's custody. Just as the restoration of liberty on reversal of a conviction is not compensation, neither is the return of money taken by the State on account of the conviction.
Colorado also suggests that "numerous pre- and post-deprivation procedures"-including the need for probable cause to support criminal charges, the jury-trial right, and the State's burden to prove guilt beyond a reasonable doubt-adequately minimize the risk of erroneous deprivation of property. Id., at 31; see id., at 31-35. But Colorado misperceives the risk at issue. The risk here involved is not the risk of wrongful or invalid conviction any criminal defendant may face. It is, instead, the risk faced by a defendant whose conviction has already been overturned that she will not recover funds taken from her solely on the basis of a conviction no longer valid. None of the above-stated procedures addresses that risk, and, as just explained, the Exoneration Act is not an adequate remedy for the property deprivation Nelson and Madden experienced.[13]
C
Colorado has no interest in withholding from Nelson and Madden money to which the State currently has zero claim of right. "Equitable [c]onsiderations," Colorado suggests, may bear on whether a State may withhold funds from criminal defendants after their convictions are overturned. Brief for Respondent 20-22. Colorado, however, has identified no such consideration relevant to petitioners' cases, nor has the State indicated any way in which the Exoneration Act embodies "equitable considerations."
IV
Colorado's scheme fails due process measurement because defendants' interest in regaining their funds is high, the risk of erroneous deprivation of those funds under the Exoneration Act is unacceptable, and *1258 the State has shown no countervailing interests in retaining the amounts in question. To comport with due process, a State may not impose anything more than minimal procedures on the refund of exactions dependent upon a conviction subsequently invalidated.
* * *
The judgments of the Colorado Supreme Court are reversed, and the cases are remanded for further proceedings not inconsistent with this opinion.
It is so ordered.
Justice GORSUCH took no part in the consideration or decision of these cases.
Justice ALITO, concurring in the judgment.
I agree that the judgments of the Colorado Supreme Court must be reversed, but I reach that conclusion by a different route.
I
The proper framework for analyzing these cases is provided by Medina v. California, 505 U.S. 437, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). Medina applies when we are called upon to "asses[s] the validity of state procedural rules which ... are part of the criminal process," id., at 443, 112 S.Ct. 2572 and that is precisely the situation here. These cases concern Colorado's rules for determining whether a defendant can obtain a refund of money that he or she was required to pay pursuant to a judgment of conviction that is later reversed. In holding that these payments must be refunded, the Court relies on a feature of the criminal law, the presumption of innocence. And since the Court demands that refunds occur either automatically or at least without imposing anything more than "minimal" procedures, see ante, at 1257, it appears that they must generally occur as part of the criminal case. For these reasons, the refund obligation is surely "part of the criminal process" and thus falls squarely within the scope of Medina. The only authority cited by the Court in support of its contrary conclusion is a footnote in a dissent. See ante, at 1255 (citing Kaley v. United States, 571 U.S. ----, ----, n. 4, 134 S.Ct. 1090, 1110 n. 4, 188 L.Ed.2d 46 (2014) (opinion of ROBERTS, C.J.)). Under Medina, a state rule of criminal procedure not governed by a specific rule set out in the Bill of Rights violates the Due Process Clause of the Fourteenth Amendment only if it offends a fundamental and deeply rooted principle of justice. 505 U.S., at 445, 112 S.Ct. 2572. And "[h]istorical practice is probative of whether a procedural rule can be characterized as fundamental." Id ., at 446, 112 S.Ct. 2572. Indeed, petitioners invite us to measure the Colorado scheme against traditional practice, reminding us that our " 'first due process cases' " recognized that " 'traditional practice provides a touchstone for constitutional analysis,' " Brief for Petitioners 26 (quoting Honda Motor Co. v. Oberg, 512 U.S. 415, 430, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994) ). Petitioners then go on to argue at some length that "[t]he traditional rule has always been that when a judgment is reversed, a person who paid money pursuant to that judgment is entitled to receive the money back." Brief for Petitioners 26; see id., at 26-30. See also Brief for National Association of Criminal Defense Lawyers as Amicus Curiae 4-14 (discussing traditional practice).
The Court, by contrast, turns its back on historical practice, preferring to balance the competing interests according to its own lights. The Court applies the balancing test set out in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), a modern invention "first conceived"
*1259 to decide what procedures the government must observe before depriving persons of novel forms of property such as welfare or Social Security disability benefits. Dusenbery v. United States, 534 U.S. 161, 167, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002). Because these interests had not previously been regarded as "property," the Court could not draw on historical practice for guidance. Mathews has subsequently been used more widely in civil cases, but we should pause before applying its balancing test in matters of state criminal procedure. "[T]he States have considerable expertise in matters of criminal procedure and the criminal process is grounded in centuries of common-law tradition." Medina, supra, at 445-446, 112 S.Ct. 2572. Applying the Mathews balancing test to established rules of criminal practice and procedure may result in "undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order." Medina, supra, at 443, 112 S.Ct. 2572. Where long practice has struck a particular balance between the competing interests of the State and those charged with crimes, we should not lightly disturb that determination. For these reasons, Medina 's historical inquiry, not Mathews, provides the proper framework for use in these cases.[1]
II
Under Medina, the Colorado scheme at issue violates due process. American law has long recognized that when an individual is obligated by a civil judgment to pay money to the opposing party and that judgment is later reversed, the money should generally be repaid. See, e.g., Northwestern Fuel Co. v. Brock, 139 U.S. 216, 219, 11 S.Ct. 523, 35 L.Ed. 151 (1891) ("The right of restitution of what one has lost by the enforcement of a judgment subsequently reversed has been recognized in the law of England from a very early period ..."); Bank of United States v. Bank of Washington, 6 Pet. 8, 17, 8 L.Ed. 299 (1832) ("On the reversal of an erroneous judgment, the law raises an obligation in the party to the record, who has received the benefit of the erroneous judgment, to make restitution to the other party for what he has lost"). This was "a remedy well known at common law," memorialized as "a part of the judgment of reversal which directed 'that the defendant be restored to all things which he has lost on occasion of the judgment aforesaid.' " 2 Ruling Case Law § 248, p. 297 (W. McKinney and B. Rich eds. 1914); Duncan v. Kirkpatrick, 13 Serg. & Rawle 292, 294 (Pa.1825).
As both parties acknowledge, this practice carried over to criminal cases. When a conviction was reversed, defendants could recover fines and monetary penalties assessed as part of the conviction. Brief for Respondent 20-21, and n. 7; Reply Brief 7-8, 11; see, e.g., Annot., Right To Recover Back Fine or Penalty Paid in Criminal Proceeding, 26 A.L.R. 1523, 1532, § VI(a) (1923) ("When a judgment imposing *1260 a fine, which is paid, is vacated or reversed on appeal, the court may order restitution of the amount paid ... "); 25 C.J. § 39, p. 1165 (W. Mack, W. Hale, & D. Kiser eds. 1921) ("Where a fine illegally imposed has been paid, on reversal of the judgment a writ of restitution may issue against the parties who received the fine").
The rule regarding recovery, however, "even though general in its application, [was] not without exceptions." Atlantic Coast Line R. Co. v. Florida, 295 U.S. 301, 309, 55 S.Ct. 713, 79 L.Ed. 1451 (1935) (Cardozo, J.). The remedy was "equitable in origin and function," and return of the money was " 'not of mere right,' " but " 'rest[ed] in the exercise of a sound discretion.' " Id., at 309, 310, 55 S.Ct. 713 (quoting Gould v. McFall, 118 Pa. 455, 456, 12 A. 336 (1888) ). This was true in both civil and criminal cases. See, e.g., 25 C. J., at 1165 (noting that "restitution [of fines paid on a conviction later reversed] is not necessarily a matter of right"); Annot., 26 A.L.R., at 1532, § VI(a) (Restitution for fines upon reversal of a conviction "is not a matter of strict legal right, but rather one for the exercise of the court's discretion"). The central question courts have asked is whether "the possessor will give offense to equity and good conscience if permitted to retain [the successful appellant's money]." Atlantic Coast Line, supra, at 309, 55 S.Ct. 713.
This history supports the Court's rejection of the Colorado Exoneration Act's procedures. The Act places a heavy burden of proof on defendants, provides no opportunity for a refund for defendants (like Nelson) whose misdemeanor convictions are reversed, and excludes defendants whose convictions are reversed for reasons unrelated to innocence. Brief for Respondent 8, 35, n. 18. These stringent requirements all but guarantee that most defendants whose convictions are reversed have no realistic opportunity to prove they are deserving of refunds. Colorado has abandoned historical procedures that were more generous to successful appellants and incorporated a court's case-specific equitable judgment. Instead, Colorado has adopted a system that is harsh, inflexible, and prevents most defendants whose convictions are reversed from demonstrating entitlement to a refund. Indeed, the Colorado General Assembly made financial projections based on the assumption that only one person every five years would qualify for a financial award under the Exoneration Act. Colorado Legislative Council Staff Fiscal Note, State and Local Revised Fiscal Impact, HB 13-1230, p. 2 (Apr. 22, 2013), online at http://leg.colorado.gov (as last visited Apr. 17, 2017). Accordingly, the Exoneration Act does not satisfy due process requirements. See Cooper v. Oklahoma, 517 U.S. 348, 356, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) (A state rule of criminal procedure may violate due process where "a rule significantly more favorable to the defendant has had a long and consistent application").
III
Although long-established practice supports the Court's judgment, the Court rests its decision on different grounds. In its Mathews analysis, the Court reasons that the reversal of petitioners' convictions restored the presumption of their innocence and that "Colorado may not presume a person, adjudged guilty of no crime, nonetheless guilty enough for monetary exactions." Ante, at 1256. The implication of this brief statement is that under Mathews, reversal restores the defendant to the status quo ante, see ante, at 1253. But the Court does not confront the obvious implications of this reasoning.
For example, if the status quo ante must be restored, why shouldn't the defendant *1261 be compensated for all the adverse economic consequences of the wrongful conviction?[2] After all, in most cases, the fines and payments that a convicted defendant must pay to the court are minor in comparison to the losses that result from conviction and imprisonment, such as attorney's fees, lost income, and damage to reputation. The Court cannot convincingly explain why Mathews ' amorphous balancing test stops short of requiring a full return to the status quo ante when a conviction is reversed. But Medina does.
The American legal system has long treated compensation for the economic consequences of a reversed conviction very differently from the refund of fines and other payments made by a defendant pursuant to a criminal judgment. Statutes providing compensation for time wrongfully spent in prison are a 20th-century innovation: By 1970, only the Federal Government and four States had passed such laws. King, Compensation of Persons Erroneously Confined by the State, 118 U. Pa. L.Rev. 1091, 1109 (1970) ; United States v. Keegan, 71 F.Supp. 623, 626 (S.D.N.Y.1947) ("[T]here seems to have been no legislation by our Government on this subject" until 1938). Many other jurisdictions have done so since, but under most such laws, compensation is not automatic. Instead, the defendant bears the burden of proving actual innocence (and, sometimes, more). King, supra, at 1110 ("The burden of proving innocence in the compensation proceeding has from the start been placed upon the claimant"); see also Kahn, Presumed Guilty Until Proven Innocent: The Burden of Proof in Wrongful Conviction Claims Under State Compensation Statutes, 44 U. Mich. J.L. Reform 123, 145 (2010) (Most U.S. compensation statutes "require that claimants prove their innocence either by a preponderance of the evidence or by clear and convincing evidence" (footnote omitted)). In construing the federal statute, courts have held that a compensation proceeding "is not ... a criminal trial" and that the burden of proof can be placed on the petitioner. United States v. Brunner, 200 F.2d 276, 279 (C.A.6 1952). As noted, Colorado and many other States have similar statutes designed narrowly to compensate those few persons who can demonstrate that they are truly innocent. The Court apparently acknowledges that these statutes pose no constitutional difficulty. That is the correct conclusion, but it is best justified by reference to history and tradition.
IV
The Court's disregard of historical practice is particularly damaging when it comes to the question of restitution. The Court flatly declares that the State is "obliged to refund ... restitution" in just the same way as fees and court costs. Ante, at 1252. This conclusion is not supported by historical practice, and it overlooks important differences between restitution, which is paid to the victims of an offense, and fines and other payments that are kept by the State.
Although restitution may be included in a criminal judgment, it has many attributes of a civil judgment in favor of the *1262 victim. This is clear under Colorado law. Although the obligation to pay restitution is included in the defendant's sentence, restitution results in a final civil judgment against the defendant in favor of the State and the victim . Colo.Rev.Stat. § 18-1.3-603(4)(a)(I) (2016). Entitlement to restitution need not be established beyond a reasonable doubt or in accordance with standard rules of evidence or criminal procedure. People v. Pagan, 165 P.3d 724, 729 (Colo.App.2006) ; Colo.Rev.Stat. §§ 18-1.3-603(2) - (3). And the judgment may be enforced either by the State or the victim. §§ 16-18.5-106(2), §§ 16-18.5-107(1)-(4).
The Court ignores the distinctive attributes of restitution, but they merit attention. Because a restitution order is much like a civil judgment, the reversal of the defendant's criminal conviction does not necessarily undermine the basis for restitution. Suppose that a victim successfully sues a criminal defendant civilly and introduces the defendant's criminal conviction on the underlying conduct as (potentially preclusive) evidence establishing an essential element of a civil claim. See, e.g., 2 K. Broun, McCormick on Evidence § 298, 473 - 477 (7th ed.2013) (discussing the admissibility, and potential preclusive effect, of a criminal conviction in subsequent civil litigation). And suppose that the defendant's criminal conviction is later reversed for a trial error that did not (and could not) infect the later civil proceeding: for example, the admission of evidence barred by the exclusionary rule or a Confrontation Clause violation. It would be unprecedented to suggest that due process requires unwinding the civil judgment simply because it rests in part on a criminal conviction that has since been reversed. And a very similar scenario could unfold with respect to a Colorado restitution judgment. The only salient difference would be that, in the Colorado case, the civil judgment would have been obtained as part of the criminal proceeding itself. It is not clear (and the Court certainly does not explain) why that formal distinction should make a substantive difference.[3]
It is especially startling to insist that a State must provide a refund after enforcing a restitution judgment on the victims' behalf in reliance on a final judgment that is then vacated on collateral review. Faced with this fact pattern, the Ninth Circuit declined to require reimbursement, reasoning that the Government was a mere "escrow agent" executing a then-valid final judgment in favor of a third party. United States v. Hayes, 385 F.3d 1226, 1230 (2004).
The Court regrettably mentions none of this. Its treatment of restitution is not grounded in any historical analysis, and-save for a brief footnote, ante, at 1253, n. 3-the Court does not account for the distinctive civil status of restitution under Colorado law (or the laws of the many other affected jurisdictions that provide this remedy to crime victims).
Nor does the Court consider how restitution's unique characteristics might affect the balance that it strikes under Mathews . Ante, at 1257. The Court summarily rejects the proposition that " 'equitable considerations' " might militate against a blanket rule requiring the refund of money paid as restitution, see ibid., but why is *1263 this so? What if the evidence amply establishes that the defendant injured the victims to whom restitution was paid but the defendant's conviction is reversed on a ground that would be inapplicable in a civil suit? In that situation, is it true, as the Court proclaims, that the State would have "no interest" in withholding a refund? Would the Court reach that conclusion if state law mandated a refund from the recipients of the restitution? And if the States and the Federal Government are always required to foot the bill themselves, would that risk discourage them from seeking restitution-or at least from providing funds to victims until the conclusion of appellate review?
It was unnecessary for the Court to issue a sweeping pronouncement on restitution. But if the Court had to address this subject to dispose of these cases, it should have acknowledged that-at least in some circumstances-refunds of restitution payments made under later reversed judgments are not constitutionally required.
* * *
For these reasons, I concur only in the judgment.

Of the $287.50 for costs and fees, $125 went to the victim compensation fund and $162.50 to the victims and witnesses assistance and law enforcement fund (VAST fund). See 362 P.3d 1070, 1071, n. 1 (Colo.2015).

Of the $1,220 for costs and fees, $125 went to the victim compensation fund and $1,095 to the VAST fund ($1,000 of which was for the special advocate surcharge). See App. 79; 364 P.3d 866, 869 (Colo.2015).

See Colo.Rev.Stat. § 24-4.1-119(1)(a) (2005) (levying victim-compensation-fund fees for "each criminal action resulting in a conviction or in a deferred judgment and sentence"); § 24-4.2-104(1)(a)(1)(I) (2005) (same, for VAST fund fees); § 24-4.2-104(1)(a)(1)(II) (same, for special advocate surcharge); § 18-1.3-603(1) (2005) (with one exception, "[e]very order of conviction ... shall include consideration of restitution"). See also 362 P.3d, at 1073 ("[T]he State pays the cost of criminal cases when a defendant is acquitted." (citing Colo.Rev.Stat. § 16-18-101(1) (2015) )). Under Colorado law, a restitution order tied to a criminal conviction is rendered as a separate civil judgment. See § 18-1.3-603(4)(a) (2005). If the conviction is reversed, any restitution order dependent on that conviction is simultaneously vacated. See People v. Scearce, 87 P.3d 228, 234-235 (Colo.App.2003).

While these cases were pending in this Court, Colorado passed new legislation to provide "[r]eimbursement of amounts paid following a vacated conviction." See Colo. House Bill 17-1071 (quoting language for Colo.Rev.Stat. § 18-1.3-603, the new provision). That legislation takes effect September 1, 2017, and has no effect on the cases before us.

Prior to the Exoneration Act, the Colorado Supreme Court recognized the competence of courts, upon reversal of a conviction, to order the refund of monetary exactions imposed on a defendant solely by reason of the conviction. Toland v. Strohl, 147 Colo. 577, 586, 364 P.2d 588, 593 (1961).

Compensation under the Exoneration Act includes $70,000 per year of incarceration for the wrongful conviction; additional sums per year served while the defendant is under a sentence of death, or placed on parole or probation or on a sex offender registry; compensation for child support payments due during incarceration; tuition waivers at state institutions of higher education for the exonerated person and for any children conceived or legally adopted before the incarceration; and reasonable attorney's fees for bringing an Exoneration Act claim. § 13-65-103(2), (3) (2016).

See Cooper v. Oklahoma, 517 U.S. 348, 356-362, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) (standard of proof to establish incompetence to stand trial); Dowling v. United States, 493 U.S. 342, 343-344, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (admissibility of testimony about a prior crime of which the defendant was acquitted); Patterson v. New York, 432 U.S. 197, 198, 201-202, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) (burden of proving affirmative defense); Medina v. California, 505 U.S. 437, 443-446, 457, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) (burden of proving incompetence to stand trial).

Citing Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), Colorado asserts that "[t]he presumption of innocence applies only at criminal trials" and thus has no application here. Brief for Respondent 40, n. 19. Colorado misapprehends Wolfish. Our opinion in that case recognized that "under the Due Process Clause," a detainee who "has not been adjudged guilty of any crime" may not be punished. 441 U.S., at 535-536, 99 S.Ct. 1861 ; see id., at 535-540, 99 S.Ct. 1861. Wolfish held only that the presumption does not prevent the government from "detain[ing a defendant] to ensure his presence at trial ... so long as [the] conditions and restrictions [of his detention] do not amount to punishment, or otherwise violate the Constitution." Id., at 536-537, 99 S.Ct. 1861.

Were Medina applicable, Colorado's Exoneration Act scheme would similarly fail due process measurement. Under Medina, a criminal procedure violates due process if "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." 505 U.S., at 445, 112 S.Ct. 2572 (quoting Patterson, 432 U.S., at 202, 97 S.Ct. 2319 ). The presumption of innocence unquestionably fits that bill.

Colorado invites a distinction between convictions merely "voidable," rather than "void," and urges that the invalidated convictions here fall in the voidable category. See Brief for Respondent 32-33, and n. 11. As Justice Hood noted in dissent, however, "reversal is reversal," regardless of the reason, "[a]nd an invalid conviction is no conviction at all." 362 P.3d, at 1080.

The dissent echoes Colorado's argument. If Nelson and Madden prevailed at trial, the dissent agrees, no costs, fees, or restitution could be exacted. See post, at 1260. But if they prevailed on appellate inspection, the State gets to keep their money. See ibid. Under Colorado law, as the dissent reads the Colorado Supreme Court's opinion, "moneys lawfully exacted pursuant to a valid conviction become public funds (or[, in the case of restitution,] the victims' money)." Post, at 1264 - 1265. Shut from the dissent's sights, however, the convictions pursuant to which the State took petitioners' money were invalid, hence the State had no legal right to retain their money. Given the invalidity of the convictions, does the Exoneration Act afford sufficient process to enable the State to retain the money? Surely, it does not.

A successful petitioner under the Exoneration Act can recover reasonable attorney's fees, § 13-65-103(2)(e)(IV), but neither a defendant nor counsel is likely to assume the risk of loss when amounts to be gained are not worth the candle.

Colorado additionally argues that defendants can request a stay of sentence pending appeal, thereby reducing the risk of erroneous deprivation. See Brief for Respondent 32; §§ 16-12-103, 18-1.3-702(1)(a) (2016). But the State acknowledged at oral argument that few defendants can meet the requirements a stay pending appeal entails. Tr. of Oral Arg. 33-34. And even when a stay is available, a trial court "may require the defendant to deposit the whole or any part of the ... costs." Colo.App. Rule 8.1(a)(3) (2016).

As I have previously observed, the Due Process Clause may have originally been understood to require only "that our Government ... proceed according to the 'law of the land'-that is, according to written constitutional and statutory provisions"-before depriving someone of life, liberty, or property. Johnson v. United States, 576 U.S. ----, ----, 135 S.Ct. 2551, 2572-2573, 192 L.Ed.2d 569 (2015) ( THOMAS , J., concurring in judgment) (quoting Hamdi v. Rumsfeld, 542 U.S. 507, 589, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (THOMAS, J., dissenting)). Because Colorado does not advance that argument, and because it is unnecessary to resolve the issue in these cases. I assume that the Due Process Clause requires some baseline procedures regardless of the provisions of Colorado law.

More specifically, the Exoneration Act entitles an exonerated defendant to compensation if he was convicted of a felony, was incarcerated, and, among other requirements, can prove by clear and convincing evidence that he is "actually innocent," meaning that his "conviction was the result of a miscarriage of justice" or that he is factually innocent. Colo.Rev.Stat. §§ 13-65-101(1)(a), 13-65-102(1)(a) (2016) ; see Nelson, 362 P.3d, at 1075. "Insufficiency of the evidence or a legal error unrelated to the person's actual innocence cannot support either exoneration or subsequent compensation under the Act." Ibid.

The Court cites one intermediate appellate case for the proposition that when a conviction is reversed, any restitution order dependent on that conviction is simultaneously vacated. Ante, at 1253, n. 3 (citing People v. Scearce, 87 P.3d 228 (Colo.App.2003) ). Scearce did not discuss whether any payments had been made to victims or-if so-whether they would be recoverable from the State. More important, Scearce is hardly the last word on the question whether due process invariably requires the refund of restitution.