Justice GORSUCH, concurring.
The majority faithfully applies our precedent and, based on a wealth of historical evidence, concludes that the Fourteenth Amendment incorporates the Eighth Amendment's Excessive Fines Clause against the States. I agree with that conclusion. As an original matter, I acknowledge, the appropriate vehicle for incorporation may well be the Fourteenth Amendment's Privileges or Immunities Clause, rather than, as this Court has long assumed, the Due Process Clause. See, e.g. , post , at 691 - 692 (THOMAS, J., concurring in judgment); McDonald v. Chicago , 561 U.S. 742, 805-858, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (THOMAS, J., concurring in part and concurring in judgment) (documenting evidence that the "privileges or immunities of citizens of the United States" include, at minimum, the individual rights enumerated in the Bill of Rights); Wildenthal, Nationalizing the Bill of Rights: Revisiting the Original Understanding of the Fourteenth Amendment in 1866-67, 68 Ohio St. L.J. 1509 (2007) ; A. Amar, The Bill of Rights: Creation and Reconstruction 163-214 (1998); M. Curtis, No State Shall Abridge: The Fourteenth Amendment and the Bill of Rights (1986). But nothing in this case turns on that question, and, regardless of the precise vehicle, there can be no serious doubt that the Fourteenth Amendment requires the States to respect the freedom from excessive fines enshrined in the Eighth Amendment.
Justice THOMAS, concurring in the judgment.
I agree with the Court that the Fourteenth Amendment makes the Eighth Amendment's prohibition on excessive fines fully applicable to the States. But I cannot agree with the route the Court takes to reach this conclusion. Instead of reading the Fourteenth Amendment's Due Process Clause to encompass a substantive right that has nothing to do with "process," I would hold that the right to be free from excessive fines is one of the "privileges or immunities of citizens of the United States" protected by the Fourteenth Amendment.
I
The Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." "On its face, this appears to grant ... United States citizens a certain collection of rights-i.e. , privileges or immunities-attributable to that status." McDonald v. Chicago , 561 U.S. 742, 808, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (THOMAS, J., concurring in part and concurring in judgment). But as I have previously explained, this Court "marginaliz[ed]" the Privileges or Immunities Clause in the late 19th century by defining the collection of rights covered by the Clause "quite narrowly." Id. , at 808-809, 130 S.Ct. 3020. Litigants seeking federal protection of substantive rights against the States thus needed "an alternative fount of such rights," and this Court "found one in a *692 most curious place," id. , at 809, 130 S.Ct. 3020 -the Fourteenth Amendment's Due Process Clause, which prohibits "any State" from "depriv[ing] any person of life, liberty, or property, without due process of law."
Because this Clause speaks only to "process," the Court has "long struggled to define" what substantive rights it protects. McDonald , supra , at 810, 130 S.Ct. 3020 (opinion of THOMAS, J.). The Court ordinarily says, as it does today, that the Clause protects rights that are "fundamental." Ante , at 686 - 687, 687 - 688, 689 - 690, 690 - 691. Sometimes that means rights that are " 'deeply rooted in this Nation's history and tradition.' " Ante , at 687 - 688, 690 - 691 (quoting McDonald , supra , at 767, 130 S.Ct. 3020 (majority opinion)). Other times, when that formulation proves too restrictive, the Court defines the universe of "fundamental" rights so broadly as to border on meaningless. See, e.g. , Obergefell v. Hodges , 576 U.S. ----, ---- - ----, 135 S.Ct. 2584, 2593, 192 L.Ed.2d 609 (2015) ("rights that allow persons, within a lawful realm, to define and express their identity"); Planned Parenthood of Southeastern Pa. v. Casey , 505 U.S. 833, 851, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) ("At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life"). Because the oxymoronic "substantive" "due process" doctrine has no basis in the Constitution, it is unsurprising that the Court has been unable to adhere to any "guiding principle to distinguish 'fundamental' rights that warrant protection from nonfundamental rights that do not." McDonald , supra , at 811, 130 S.Ct. 3020 (opinion of THOMAS, J.). And because the Court's substantive due process precedents allow the Court to fashion fundamental rights without any textual constraints, it is equally unsurprising that among these precedents are some of the Court's most notoriously incorrect decisions. E.g. , Roe v. Wade , 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) ; Dred Scott v. Sandford , 19 How. 393, 450, 15 L.Ed. 691 (1857).
The present case illustrates the incongruity of the Court's due process approach to incorporating fundamental rights against the States. Petitioner argues that the forfeiture of his vehicle is an excessive punishment. He does not argue that the Indiana courts failed to " 'proceed according to the "law of the land"-that is, according to written constitutional and statutory provisions,' " or that the State failed to provide "some baseline procedures." Nelson v. Colorado , 581 U.S. ----, ----, n. 1, 137 S.Ct. 1249, 1264, n. 1, 197 L.Ed.2d 611 (2017) (THOMAS, J., dissenting). His claim has nothing to do with any "process" "due" him. I therefore decline to apply the "legal fiction" of substantive due process. McDonald , 561 U.S., at 811, 130 S.Ct. 3020 (opinion of THOMAS, J.).
II
When the Fourteenth Amendment was ratified, "the terms 'privileges' and 'immunities' had an established meaning as synonyms for 'rights.' " Id. , at 813, 130 S.Ct. 3020. Those "rights" were the "inalienable rights" of citizens that had been "long recognized," and "the ratifying public understood the Privileges or Immunities Clause to protect constitutionally enumerated rights" against interference by the States. Id. , at 822, 837, 130 S.Ct. 3020. Many of these rights had been adopted from English law into colonial charters, then state constitutions and bills of rights, and finally the Constitution. "Consistent with their English heritage, the founding generation generally did not consider many of the rights identified in [the Bill of Rights] as new entitlements, but as inalienable rights of all men, given legal *693 effect by their codification in the Constitution's text." Id. , at 818, 130 S.Ct. 3020.
The question here is whether the Eighth Amendment's prohibition on excessive fines was considered such a right. The historical record overwhelmingly demonstrates that it was.
A
The Excessive Fines Clause "was taken verbatim from the English Bill of Rights of 1689," United States v. Bajakajian , 524 U.S. 321, 335, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), which itself formalized a longstanding English prohibition on disproportionate fines. The Charter of Liberties of Henry I, issued in 1101, stated that "[i]f any of my barons or men shall have committed an offence he shall not give security to the extent of forfeiture of his money, as he did in the time of my father, or of my brother, but according to the measure of the offence so shall he pay ...." Sources of English Legal and Constitutional History ¶8, p. 50 (M. Evans & R. Jack eds. 1984) (emphasis added). Expanding this principle, Magna Carta required that "amercements (the medieval predecessors of fines) should be proportioned to the offense and that they should not deprive a wrongdoer of his livelihood," Bajakajian , supra , at 335, 118 S.Ct. 2028 :
"A free man shall be amerced for a small fault only according to the measure thereof, and for a great crime according to its magnitude, saving his position; and in like manner, a merchant saving his trade, and a villein saving his tillage, if they should fall under Our mercy." Magna Carta, ch. 20 (1215), in A. Howard, Magna Carta: Text & Commentary 42 (rev. ed. 1998).
Similar clauses levying amercements "only in proportion to the measure of the offense" applied to earls, barons, and clergymen. Chs. 21-22, ibid. One historian posits that, due to the prevalence of amercements and their use in increasing the English treasury, "[v]ery likely there was no clause in Magna Carta more grateful to the mass of the people than that about amercements." Pleas of the Crown for the County of Gloucester xxxiv (F. Maitland ed. 1884). The principle was reiterated in the First Statute of Westminster, which provided that no man should "be amerced, without reasonable cause, and according to the quantity of his Trespass." 3 Edw. I, ch. 6 (1275). The English courts have long enforced this principle. In one early case, for example, the King commanded the bailiff "to take a moderate amercement proper to the magnitude and manner of th[e] offense, according to the tenour of the Great Charter of the Liberties of England," and the bailiff was sued for extorting "a heavier ransom." Le Gras v. Bailiff of Bishop of Winchester , Y.B. Mich. 10 Edw. II, pl. 4 (1316), reprinted in 52 Selden Society 3, 5 (1934); see also Richard Godfrey's Case , 11 Co. Rep. 42a, 44a, 77 Eng. Rep. 1199, 1202 (1615) (excessive fines are "against law").
During the reign of the Stuarts in the period leading up to the Glorious Revolution of 1688-1689, fines were a flashpoint "in the constitutional and political struggles between the king and his parliamentary critics." L. Schwoerer, The Declaration of Rights, 1689, p. 91 (1981) (Schwoerer). From 1629 to 1640, Charles I attempted to govern without convening Parliament, but "in the absence of parliamentary grants," he needed other ways of raising revenue. 4 H. Walter, A History of England 135 (1834); see 1 T. Macaulay, History of England 85 (1899). He thus turned "to exactions, some odious and obsolete, some of very questionable legality, and others clearly against law." 1 H. Hallam, Constitutional History of England: From the Accession of Henry VII to the Death of *694 George II 462 (1827) (Hallam); see 4 Walter, supra , at 135.
The Court of Star Chamber, for instance, "imposed heavy fines on the king's enemies," Schwoerer 91, in disregard "of the provision of the Great Charter, that no man shall be amerced even to the full extent of his means...." 2 Hallam 46-47. "[T]he strong interest of th[is] court in these fines ... had a tendency to aggravate the punishment...." 1 id. , at 490. "The statute abolishing" the Star Chamber in 1641 "specifically prohibited any court thereafter from ... levying ... excessive fines." Schwoerer 91.
"But towards the end of Charles II's reign" in the 1670s and early 1680s, courts again "imposed ruinous fines on the critics of the crown." Ibid. In 1680, a committee of the House of Commons "examined the transcripts of all the fines imposed in King's Bench since 1677" and found that "the Court of King's Bench, in the Imposition of Fines on Offenders of late Years, hath acted arbitrarily, illegally, and partially; favouring Papists and Persons popishly affected; and excessively oppressing his Majesty's Protestant Subjects." Ibid. ; 9 Journals of the House of Commons 692 (Dec. 23, 1680). The House of Commons determined that the actions of the judges of the King's Bench, particularly the actions of Chief Justice William Scroggs, had been so contrary to law that it prepared articles of impeachment against him. The articles alleged that Scroggs had "most notoriously departed from all Rules of Justice and Equality, in the Imposition of Fines upon Persons convicted of Misdemeanors" without "any Regard to the Nature of the Offences, or the Ability of the Persons." Id. , at 698.
Yet "[o]ver the next few years fines became even more excessive and partisan." Schwoerer 91. The King's Bench, presided over by the infamous Chief Justice Jeffreys, fined Anglican cleric Titus Oates 2,000 marks (among other punishments) for perjury. Id. , at 93. For speaking against the Duke of York, the sheriff of London was fined £ 100,000 in 1682, which corresponds to well over $ 10 million in present-day dollars[1] -"an amount, which, as it extended to the ruin of the criminal, was directly contrary to the spirit of [English] law." The History of England Under the House of Stuart, pt. 2, p. 801 (1840). The King's Bench fined Sir Samuel Barnadiston £ 10,000 for allegedly seditious letters, a fine that was overturned by the House of Lords as "exorbitant and excessive." 14 Journals of the House of Lords 210 (May 14, 1689). Several members of the committees that would draft the Declaration of Rights-which included the prohibition on excessive fines that was enacted into the English Bill of Rights of 1689-had themselves "suffered heavy fines." Schwoerer 91-92. And in 1684, judges in the case of John Hampden held that Magna Carta did not limit "fines for great offences" against the King, and imposed a £ 40,000 fine. Trial of Hampden , 9 State Trials 1054, 1125 (K. B. 1684); 1 J. Stephen, A History of the Criminal Law of England 490 (1883).
"Freedom from excessive fines" was considered "indisputably an ancient right of the subject," and the Declaration of Rights' indictment against James II "charged that during his reign judges had imposed excessive fines, thereby subverting the laws and liberties of the kingdom." Schwoerer 90. Article 10 of the Declaration declared "[t]hat excessive Bayle ought not *695 to be required nor excessive fynes imposed nor cruel and unusuall Punishments inflicted." Id. , at 297.
Shortly after the English Bill of Rights was enacted, Parliament addressed several excessive fines imposed before the Glorious Revolution. For example, the House of Lords overturned a £ 30,000 fine against the Earl of Devonshire as "excessive and exorbitant, against Magna Charta, the common right of the subject, and against the law of the land." Case of Earl of Devonshire , 11 State Trials 1354, 1372 (K. B. 1687). Although the House of Lords refused to reverse the judgments against Titus Oates, a minority argued that his punishments were "contrary to Law and ancient Practice" and violated the prohibition on "excessive Fines." Harmelin v. Michigan , 501 U.S. 957, 971, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) ; Trial of Oates , 10 State Trials 1080, 1325 (K. B. 1685). The House of Commons passed a bill to overturn Oates's conviction, and eventually, after a request from Parliament, the King pardoned Oates. Id. , at 1329-1330.
Writing a few years before our Constitution was adopted, Blackstone-"whose works constituted the preeminent authority on English law for the founding generation," Alden v. Maine , 527 U.S. 706, 715, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) -explained that the prohibition on excessive fines contained in the English Bill of Rights "had a retrospect to some unprecedented proceedings in the court of king's bench." 4 W. Blackstone, Commentaries 372 (1769). Blackstone confirmed that this prohibition was "only declaratory ... of the old constitutional law of the land," which had long "regulated" the "discretion" of the courts in imposing fines. Ibid.
In sum, at the time of the founding, the prohibition on excessive fines was a longstanding right of Englishmen.
B
"As English subjects, the colonists considered themselves to be vested with the same fundamental rights as other Englishmen," McDonald , 561 U.S., at 816, 130 S.Ct. 3020 (opinion of THOMAS, J.), including the prohibition on excessive fines. E.g. , J. Dummer, A Defence of the New-England Charters 16-17 (1721) ("The Subjects Abroad claim the Privilege of Magna Charta , which says that no Man shall be fin'd above the Nature of his Offence, and whatever his Miscarriage be, a Salvo Contenemento suo is to be observ'd by the Judge"). Thus, the text of the Eighth Amendment was " 'based directly on ... the Virginia Declaration of Rights,' which 'adopted verbatim the language of the English Bill of Rights.' " Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc. , 492 U.S. 257, 266, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (quoting Solem v. Helm , 463 U.S. 277, 285, n. 10, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) ); see Jones v. Commonwealth , 5 Va. 555, 557 (1799) (opinion of Carrington, J.) (explaining that the clause in the Virginia Declaration of Rights embodied the traditional legal understanding that any "fine or amercement ought to be according to the degree of the fault and the estate of the defendant").
When the States were considering whether to ratify the Constitution, advocates for a separate bill of rights emphasized the need for an explicit prohibition on excessive fines mirroring the English prohibition. In colonial times, fines were "the drudge-horse of criminal justice," "probably the most common form of punishment." L. Friedman, Crime and Punishment in American History 38 (1993). To some, this fact made a constitutional prohibition on excessive fines all the more important. As the well-known Anti-Federalist Brutus argued in an essay, a prohibition *696 on excessive fines was essential to "the security of liberty" and was "as necessary under the general government as under that of the individual states; for the power of the former is as complete to the purpose of requiring bail, imposing fines, inflicting punishments, ... and seizing ... property ... as the other." Brutus II (Nov. 1, 1787), in The Complete Bill of Rights 621 (N. Cogan ed. 1997). Similarly, during Virginia's ratifying convention, Patrick Henry pointed to Virginia's own prohibition on excessive fines and said that it would "depart from the genius of your country" for the Federal Constitution to omit a similar prohibition. Debate on Virginia Convention (June 14, 1788), in 3 Debates on the Federal Constitution 447 (J. Elliot 2d ed. 1854). Henry continued: "[W]hen we come to punishments, no latitude ought to be left, nor dependence put on the virtue of representatives" to "define punishments without this control." Ibid.
Governor Edmund Randolph responded to Henry, arguing that Virginia's charter was "nothing more than an investiture, in the hands of the Virginia citizens, of those rights which belonged to British subjects." Id. , at 466. According to Randolph, "the exclusion of excessive bail and fines ... would follow of itself without a bill of rights," for such fines would never be imposed absent "corruption in the House of Representatives, Senate, and President," or judges acting "contrary to justice." Id. , at 467-468.
For all the debate about whether an explicit prohibition on excessive fines was necessary in the Federal Constitution, all agreed that the prohibition on excessive fines was a well-established and fundamental right of citizenship. When the Excessive Fines Clause was eventually considered by Congress, it received hardly any discussion before "it was agreed to by a considerable majority." 1 Annals of Cong. 754 (1789). And when the Bill of Rights was ratified, most of the States had a prohibition on excessive fines in their constitutions.[2]
Early commentary on the Clause confirms the widespread agreement about the fundamental nature of the prohibition on excessive fines. Justice Story, writing a few decades before the ratification of the Fourteenth Amendment, explained that the Eighth Amendment was "adopted, as an admonition to all departments of the national government, to warn them against such violent proceedings, as had taken place in England in the arbitrary reigns of some of the Stuarts," when "[e]normous fines and amercements were ... sometimes imposed." 3 J. Story, Commentaries on the Constitution of the United States § 1896, pp. 750-751 (1833). Story included the prohibition on excessive fines as a right, along with the "right to bear arms" and others protected by the Bill of Rights, that "operates, as a qualification upon powers, actually granted by the people to the government"; without such a "restrict[ion]," the government's "exercise or *697 abuse" of its power could be "dangerous to the people." Id. , § 1858, at 718-719.
Chancellor Kent likewise described the Eighth Amendment as part of the "right of personal security ... guarded by provisions which have been transcribed into the constitutions in this country from magna carta , and other fundamental acts of the English Parliament." 2 J. Kent, Commentaries on American Law 9 (1827). He understood the Eighth Amendment to "guard against abuse and oppression," and emphasized that "the constitutions of almost every state in the Unio[n] contain the same declarations in substance, and nearly in the same language." Ibid. Accordingly, "they must be regarded as fundamental doctrines in every state, for all the colonies were parties to the national declaration of rights in 1774, in which the ... rights and liberties of English subjects were peremptorily claimed as their undoubted inheritance and birthright."Ibid. ; accord, W. Rawle, A View of the Constitution of the United States of America 125 (1825) (describing the prohibition on excessive fines as "founded on the plainest principles of justice").
C
The prohibition on excessive fines remained fundamental at the time of the Fourteenth Amendment. In 1868, 35 of 37 state constitutions "expressly prohibited excessive fines." Ante , at 688. Nonetheless, as the Court notes, abuses of fines continued, especially through the Black Codes adopted in several States. Ante , at 688 - 689. The "centerpiece" of the Codes was their "attempt to stabilize the black work force and limit its economic options apart from plantation labor." E. Foner, Reconstruction: America's Unfinished Revolution 1863-1877, p. 199 (1988). Under the Codes, "the state would enforce labor agreements and plantation discipline, punish those who refused to contract, and prevent whites from competing among themselves for black workers." Ibid. The Codes also included " 'antienticement' measures punishing anyone offering higher wages to an employee already under contract." Id. , at 200.
The 39th Congress focused on these abuses during its debates over the Fourteenth Amendment, the Civil Rights Act of 1866, and the Freedmen's Bureau Act. During those well-publicized debates, Members of Congress consistently highlighted and lamented the "severe penalties" inflicted by the Black Codes and similar measures, Cong. Globe, 39th Cong., 1st Sess., 474 (1866) (Sen. Trumbull), suggesting that the prohibition on excessive fines was understood to be a basic right of citizenship.
For example, under Mississippi law, adult "freedmen, free negroes and mulattoes" "without lawful employment" faced $ 50 in fines and 10 days' imprisonment for vagrancy. Reports of Assistant Commissioners of Freedmen, and Synopsis of Laws on Persons of Color in Late Slave States, S. Exec. Doc. No. 6, 39th Cong., 2d Sess., § 2, p. 192 (1867). Those convicted had five days to pay or they would be arrested and leased to "any person who will, for the shortest period of service, pay said fine and forfeiture and all costs." § 5, ibid. Members of Congress criticized such laws "for selling [black] men into slavery in punishment of crimes of the slightest magnitude." Cong. Globe, 39th Cong., 1st Sess., 1123 (1866) (Rep. Cook); see id. , at 1124 ("It is idle to say these men will be protected by the States").
Similar examples abound. One congressman noted that Alabama's "aristocratic and anti-republican laws, almost reenacting slavery, among other harsh inflictions impose ... a fine of fifty dollars and six months' imprisonment on any servant or *698 laborer (white or black) who loiters away his time or is stubborn or refractory." Id. , at 1621 (Rep. Myers). He also noted that Florida punished vagrants with "a fine not exceeding $ 500 and imprison[ment] for a term not exceeding twelve months, or by being sold for a term not exceeding twelve months, at the discretion of the court." Ibid. At the time, such fines would have been ruinous for laborers. Cf. id. , at 443 (Sen. Howe) ("A thousand dollars! That sells a negro for his life").
These and other examples of excessive fines from the historical record informed the Nation's consideration of the Fourteenth Amendment. Even those opposed to civil-rights legislation understood the Privileges or Immunities Clause to guarantee those "fundamental principles" "fixed" by the Constitution, including "immunity from ... excessive fines." 2 Cong. Rec. 384-385 (1874) (Rep. Mills); see also id. , at App. 241 (Sen. Norwood). And every post-1855 state constitution banned excessive fines. S. Calabresi & S. Agudo, Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868, 87 Texas L. Rev. 7, 82 (2008). The attention given to abusive fines at the time of the Fourteenth Amendment, along with the ubiquity of state excessive-fines provisions, demonstrates that the public continued to understand the prohibition on excessive fines to be a fundamental right of American citizenship.
* * *
The right against excessive fines traces its lineage back in English law nearly a millennium, and from the founding of our country, it has been consistently recognized as a core right worthy of constitutional protection. As a constitutionally enumerated right understood to be a privilege of American citizenship, the Eighth Amendment's prohibition on excessive fines applies in full to the States.

See Currency Converter: 1270-2017 (estimating the 2017 equivalent of £ 100,000 in 1680), http://nationalarchives.gov.uk/currency-converter (as last visited Feb. 8, 2019)

Del. Const., Art. I, § 11 (1792), in 1 Federal and State Constitutions 569 (F. Thorpe ed. 1909); Md. Const., Decl. of Rights, Art. XXII (1776), in 3 id ., at 1688; Mass. Const., pt. 1, Art. XXVI (1780), in id ., at 1892; N.H. Const., pt. 1, Art. 1, § XXXIII (1784), in 4 id ., at 2457; N.C. Const., Decl. of Rights, Art. X (1776), in 5 id ., at 2788; Pa. Const., Art. IX, § 13 (1790), in id ., at 3101; S.C. Const., Art. IX, § 4 (1790), in 6 id ., at 3264; Va. Const., Bill of Rights, § 9 (1776), in 7 id ., at 3813. Vermont had a clause specifying that "all fines shall be proportionate to the offences." Vt. Const., ch. II, § XXIX (1786), in id ., at 3759. Georgia's 1777 Constitution had an excessive fines clause, Art. LIX, but its 1789 Constitution did not. And the Northwest Ordinance provided that "[a]ll fines shall be moderate; and no cruel or unusual punishments inflicted." § 14, Art. 2 (1787)