**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
DECEMBER 11, 2025

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
DECEMBER 11, 2025

SARAH R. PENDLETON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 103627-2 |
| | ) | (cons. w/ 103673-6) |
| v. | ) | |
| | ) | En Banc |
| SABRA K. DANIELSON and SIMONE | ) | |
| RENEE NELSON, | ) | Filed: December 11, 2025 |
| | ) | |
| Petitioners. | ) | |
| | ) | |

MADSEN, J.—Primarily at issue in this consolidated case is whether individuals with invalidated convictions have a right to be reimbursed for all court imposed financial obligations, including labor performed in community service work. Simone Nelson and Sabra Danielson satisfied some of their financial obligations through community service and sought to be reimbursed for that labor after their convictions for felony drug possession were invalidated pursuant to *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021). Their request was denied in the trial court, and Nelson and Danielson argue this denial violated their right to equal protection of the law. Nelson and Danielson do not

demonstrate a right to reimbursement for labor, the threshold equal protection requirement.[1] Accordingly, we affirm.

BACKGROUND

Nelson and Danielson pleaded guilty in separate cases to unlawful possession of a controlled substance. In 1995, Nelson pleaded guilty to possession of methamphetamine; the court imposed a sentence of 52 days in jail with credit for time served and $1,467.90 in legal financial obligations (LFOs). The court ordered that some of these LFOs could be satisfied by community service. In 1998, Nelson pleaded guilty to another count of possession of methamphetamine. The sentencing court imposed 60 days in jail, with 30 of those days converted into community service hours, and $1,210 in LFOs. In total, Nelson was assessed approximately $2,677 in LFOs. Nelson paid $1,900 of that total in cash and was eventually credited with $560 for completed community service work.

In 2003, Danielson pleaded guilty to possession of amphetamine. The sentencing court imposed 58 days of confinement with credit for time served and converted 30 days to community service hours. The court also imposed $1,060 in LFOs. Like Nelson,

---

[1] We are aware of the hardships LFOs can impose on individuals, especially for those who struggle to pay them. We share the dissent's concerns about legal debt and its collateral consequences. The legislature has addressed some of these concerns in recent years, for example by preventing interest accrual on certain nonrestitution LFOs. RCW 10.82.090(1). Defendants may also petition for remission of discretionary costs, and courts may provide other relief such as additional time to pay LFOs, reducing installment amounts, or allowing payment in the form of community restitution hours. RCW 10.01.160(4), .180(5). The legislature also created the relief sought in this case: reimbursement for court fines after our decision in *Blake* invalidated simple drug possession convictions. 197 Wn.2d 170. However, the legal issue before us today is a narrow one: whether Nelson and Danielson brought an actionable equal protection claim. We conclude they did not.

Danielson paid some of her LFOs in cash. From 2004 to 2005, Danielson completed over 250 hours of community service, and the court ordered certain excess time credited against her LFOs at minimum wage rate.

In 2021, this court struck down Washington's simple possession law as unconstitutional. *Blake*, 197 Wn.2d at 195. Following that decision, Nelson and Danielson filed CrR 7.8 motions seeking to vacate their convictions for felony drug possession. Both asked to be reimbursed for LFO payments made in cash and community service hours. The State agreed to reimbursement for monetary payments but opposed reimbursement for community service work. The court agreed with the State in both cases, ordering the convictions for Nelson and Danielson to be vacated and remitting the sums paid in cash. Nelson and Danielson appealed separately.

Nelson and Danielson made similar arguments in the Court of Appeals. Both argued that the trial court's decision to deny reimbursement for *all* LFO payments, including community service hours, violated their constitutional rights to due process and equal protection and unjustly enriched the State. The Court of Appeals disagreed. In Nelson's case, the court concluded that no substantive due process violation occurred because there is no substantive due process right to monetary reimbursement for community service work in lieu of payment of LFOs. *State v. Nelson*, 32 Wn. App. 2d 679, 686-89, 558 P.3d 197 (2024). The court further concluded that equal protection was not violated because Nelson could not show she was treated disparately from similarly situated individuals based on her financial status, and, even assuming so, the decision not

to reimburse for community service hours survived rational basis review. *Id*. at 690-96. The Court of Appeals affirmed the trial court's decisions in *Nelson*, *id*. at 699. The Court of Appeals echoed this reasoning and outcome in Danielson's case. *State v. Danielson*, No. 57675-9-II, slip op. at 7-13 (Wash. Ct. App. Oct. 22, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2057675-9-II%20Unpublished%20Opinion.pdf.

Nelson and Danielson separately sought discretionary review in this court. We granted review and consolidated the cases. We received amici curiae briefing in support of Nelson and Danielson.

### ANALYSIS

Nelson and Danielson argue they were denied equal protection based on their economic status. Specifically, they contend that they were discriminated against because they were not wealthy enough to pay their LFOs in cash and, unlike those similarly situated defendants, Nelson and Danielson were not fully reimbursed for the labor they performed in satisfaction of some LFOs.

The equal protection clause of the Fourteenth Amendment provides that the State cannot deny "any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. "Under the equal protection clause of the Washington State Constitution, article I, section 12, and the [F]ourteenth Amendment to the United States Constitution, persons similarly situated with respect to the legitimate purpose of the law must receive like treatment." *State v. Coria*, 120 Wn.2d 156, 169, 839 P.2d 890 (1992).

4

"The threshold question in any equal protection analysis is which standard of judicial review applies." *State v. Shawn P.*, 122 Wn.2d 553, 560, 859 P.2d 1220 (1993) (citing *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 139, 744 P.2d 1032 (1987)). The right at issue or type of classification determines the appropriate standard of review. *State v. Osman*, 157 Wn.2d 474, 484, 139 P.3d 334 (2006). Strict scrutiny applies to a suspect class, including race, nationality, or alienage or if it affects a fundamental right. *Nielsen v. Wash. State Bar Ass'n*, 90 Wn.2d 818, 820, 585 P.2d 1191 (1978). Intermediate scrutiny applies to an important right or semisuspect classification. *State v. Manussier*, 129 Wn.2d 652, 673, 921 P.2d 473 (1996). If the state action does not threaten a fundamental or important right, or if the person is not a member of a suspect or semisuspect class, a law receives rational basis review. *Shawn P.*, 122 Wn.2d at 560.

The individual bringing an equal protection claim must also show that they are similarly situated with other persons. *Osman*, 157 Wn.2d at 484. The defendant must establish that they received disparate treatment due to membership in a class of similarly situated persons and that the disparate treatment was the result of intentional or purposeful discrimination. *Id*.

Nelson and Danielson claim an important, if not fundamental, right to reimbursement for all LFOs. *See id*. They argue that the right flows from the constitutional principles of due process and the presumption of innocence as set out in

*Nelson v. Colorado*, 581 U.S. 128, 135-36, 137 S. Ct. 1249, 197 L. Ed. 2d 611 (2017).[2]

Suppl. Br. of Pet'rs 13-14. But *Nelson* does not identify a right to be reimbursed for labor in lieu of payment for LFOs. *Nelson* concerned a procedural due process challenge to a state statute requiring individuals with invalidated convictions to prove their innocence to recover funds paid to the State. 581 U.S. at 132-34. The Court applied the *Mathews*[3] balancing test, recognizing that the individuals with invalid convictions had an "obvious interest in regaining *the money* they paid" to the State. *Id.* at 135 (emphasis added). The Court noted that once a conviction is overturned, the presumption of innocence was restored. *Id.* at 136 (citing *Coffin v. United States*, 156 U.S. 432, 453, 15 S. Ct. 394, 39 L. Ed. 481 (1895)). Consequently, the State could not retain funds taken solely based on invalid convictions, and the State could not presume a person guilty enough for monetary penalties. *Id.* The Court also concluded that the State had no countervailing interest in retaining the funds in question. *Id.* at 136-39. *Nelson* held, therefore, that the statutory scheme failed to satisfy due process measurements. *Id.* at 139.

The *Nelson* Court recognized a defendant's private interest in recovering property in the form of money.[4] The Court discussed constitutional rights solely in the context of

---

[2] Washington lawmakers established the *Blake* Refund Bureau to assist local governments with refunding court fines for individuals with invalidated convictions for simple drug possession. *E.g.*, LAWS OF 2022, ch. 297, § 114. Nelson and Danielson identify the statutes providing funds to the *Blake* refund program but anchor their equal protection claim in the federal constitution. *See* Suppl. Br. of Pet'rs at 8, 13-14.

[3] *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

[4] The dissent relies on the trial court "convert[ing]" Nelson's and Danielson's community service hours into "monetary value" to conclude that they have an interest to reimbursement similar to

the presumption of innocence and held that this foundational principle prevents a State from requiring defendants to prove their innocence to recoup fees paid pursuant to overturned convictions. *Id.* at 139. *Nelson*'s discussion is narrow, limited to a defendant's interest in property.

Contrary to Nelson's and Danielson's claim, *Nelson* does not identify a right— fundamental or otherwise—to be reimbursed for community service work performed in satisfaction of LFOs. The only fundamental constitutional principle identified in the case was the presumption of innocence, and the Court applied it to a statutory scheme requiring proof of innocence to recover court fees. *Id*. at 135-36 (citing *Coffin*, 156 U.S. at 453). Nelson and Danielson do not connect the presumption of innocence to the refusal to refund their community service hours. No similar scheme or indeed any statute is at issue here. Further, Nelson and Danielson did not bring a due process claim; they argued only that their right to equal protection was violated and, even so, they do not explain how *Nelson*'s private interest in explicitly monetary payments implicates equal protection or extends beyond property to include community service hours.[5]

---

the defendant in *Nelson*, who paid their legal financial obligations in cash. Dissent (Mungia, J.) at 20. But a court's accounting of labor does not transform that labor into money.

[5] The dissent contends both state and federal case law identifies a right to reimbursement for labor. In support, the dissent reviews cases in which a defendant's economic status prevented them from meaningfully engaging in a trial or resulted in a loss of *liberty*. *See id*. at 21-25. In *Mota*, for example, this court explained that it would apply a "higher level of scrutiny . . . to cases involving a deprivation of a liberty interest due to indigency." *In re Pers. Restraint of Mota*, 114 Wn.2d 465, 474, 788 P.2d 538 (1990); *see also In re Pers. Restraint of Fogle*, 128 Wn.2d 56, 70-71, 904 P.2d 722 (1995) (Alexander, J., dissenting) ("[T]he central issue in the case concerns an alleged denial of a liberty interest based on wealth."). *State v. Phelan* concerned a class of people serving time in jail before trial while wealthier individuals posted bail and remained free pending trial. 100 Wn.2d 508, 514, 671 P.2d 1212 (1983). The *Phelan*

To the extent *Nelson* applies in this case, it would not change the result. *Nelson* acknowledges an individual with an overturned conviction has a private, due process interest in recovering *property* via monetary payments to the State. 581 U.S. at 134. Nelson and Danielson were reimbursed for the funds paid to their LFOs. This satisfies *Nelson*'s due process considerations.

Nelson and Danielson also claim membership in a semisuspect class. *See Osman*, 157 Wn.2d at 484. Specifically, Nelson and Danielson contend they were treated differently because they are poor: they had to pay their debt in labor while wealthier individuals paid in cash. Suppl. Br. of Pet'rs at 15-18; Wash. Sup. Ct. oral arg., *State v. Danielson*, No. 103627-2 (June 12, 2025), at 11 min., 48 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/washington-state-supreme-court-2025061150/.

Nelson and Danielson do not demonstrate that their treatment differed from the treatment of others. The record does not identify the authority under which the trial court allowed Nelson and Danielson to perform community service, and neither Nelson nor Danielson provides additional authority in this court.[6] They acknowledge that the option

---

court recognized two interests: a deprivation of liberty and classification based solely on wealth. *Id.* Unlike the defendants in *Mota*, *Fogle*, and *Phelan*, Nelson and Danielson were not deprived of any liberty interest. Thus, neither *Fogle* nor any of the other cited cases is, as the dissent claims, "directly on-point here." Dissent (Mungia, J.) at 26.

[6] The Court of Appeals referred to RCW 10.01.160(4), which permits a court to "'modify the method of payment,'" if paying costs poses a manifest hardship to the defendant. *Nelson*, 32 Wn. App. 2d at 691 (quoting RCW 10.01.160(4)); *Danielson*, No. 57675-9-II, slip op. at 11. Assuming RCW 10.01.160(4) applies, it allows defendants to "petition the sentencing court" for modification. The provision is silent as to economic status. Any defendant who can show "manifest hardship," for whatever reason, may petition the court for modification from cash

8

to perform community service is "not explicitly limited" to the indigent or poor. Wash. Sup. Ct. oral arg., *supra*, at 11 min., 40 sec. Instead, they urge the court to *assume*, based on amici curiae briefing, that individuals who can pay LFOs in cash will do so rather than engage in minimum wage community service work. *Id.* at 11 min., 48 sec. The briefing from amici describes the challenges of indigent individuals with substantial LFO obligations who performed community service and explains some of the reforms made to the LFO system. *See* Br. of Amici Curiae on Behalf of Civ. Survival et al. at 4-14. The briefing does not, however, demonstrate that convicted individuals of higher wealth status *will* choose to pay LFOs rather than perform community service or that persons of lesser wealth status will *choose* to perform community service rather than pay LFOs.

Establishing an equal protection violation requires more than assumption. The burden rests on the individual asserting the violation to establish disparate treatment. *Osman*, 157 Wn.2d at 484. Nelson and Danielson assert they had no choice due to their economic status, but they were not ordered to perform community service. They received this benefit as an alternative to paying their court imposed financial obligations. While it may be correct that many individuals who perform community service are of lower economic status, this inference does not establish a *wealth-based classification*.[7]

---

payment to community service. The provision does not turn on whether the petitioner is indigent, poor, or wealthy.

[7] There also appears to be some uncertainty in the record as to whether Nelson and Danielson were indigent when they were credited with community service hours. *See* Wash. Sup. Ct. oral arg., *supra*, at 14 min., 15 sec. (Nelson's and Danielson's counsel acknowledged that the record only "come[s] close to reaching the question of establishing indigence at the time that Ms. Nelson was credited . . . it may be less clear from the record [for] Ms. Danielson."). Nelson and Danielson were each appointed public defenders and by agreement of the parties, the court found

Moreover, it is not certain that any state action occurred here. *See Long v. Chiropractic Soc'y of Wash.*, 93 Wn.2d 757, 761, 613 P.2d 124 (1980) (recognizing equal protection claims require "significant state action"). Nelson and Danielson contend that there is no meaningful distinction between paying LFOs in cash and satisfying them through labor on behalf of the State. But the record indicates that Danielson's community service was performed at nonprofit organizations and not for the State. Clerk's Papers (Danielson) at 25-29, 64 (log of hours worked at Lutheran Community Services Northwest and Port Angeles Food Bank). For Nelson, the record reflects her community service hours but does not indicate where or for what entity that work was performed.

Without a right or interest in reimbursement for labor in lieu of monetary LFO payments, disparate treatment, class membership, or state action, Nelson and Danielson provide no basis for an equal protection challenge. Absent these showings, we find it unnecessary to decide the applicable level of scrutiny.[8]

Danielson indigent. On the other hand, the judgments and sentences for both included language finding they had the ability or likely future ability to pay imposed LFOs; and, both Nelson and Danielson paid some portion of their LFOs in cash.

[8] The dissent asserts that the decision not to apply some level of scrutiny to Nelson's and Danielson's claim is erroneous. Dissent (Mungia, J.) at 17. Here, as previously discussed, Nelson and Danielson do not show disparate treatment. Therefore, there is no need to apply any level of scrutiny because there is no basis for an equal protection claim. *See, e.g.*, *United States v. King Mountain Tobacco Co.*, 131 F. Supp. 3d 1088, 1097 (E.D. Wash. 2015) ("[T]he Court need not apply the rational basis test in this case because there is no evidence of unequal treatment.").

CONCLUSION

Nelson and Danielson do not show that the refusal to reimburse them for community service in lieu of payment for LFOs violated their constitutional right to equal protection. Therefore, we affirm.

_____
Madsen, J.

WE CONCUR:

_____
Stephens, C.J.

_____
Johnson, J.

_____

_____
Whitener, J.

_____
Gordon McCloud, J.

_____

No. 103627-2

YU, J. (dissenting) — I agree with the majority's summation of federal equal protection law and its limited application to the issue before us. However, I cannot overlook the inherent unfairness of disregarding the economic value of community service used to pay legal financial obligations in *Blake*[1] cases. Thus, I must dissent from the majority in result.

Nevertheless, I cannot join the analysis proffered by the dissent of Justice Mungia. I am not persuaded that current federal due process and equal protection doctrines fit the fact pattern before us, and I am reluctant to attempt to expand these doctrines at this time. Doing so risks weakening established jurisprudence that is already being weakened, as the United States Supreme Court "retreat[s] from meaningful judicial review exactly where it matters most." *United States v. Skrmetti*, 605 U.S. 495, 579, 145 S. Ct. 1816, 222 L. Ed. 2d 136 (2025) (Sotomayor, J., dissenting).

---

[1] *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021).

1

It must be emphasized that the court's decision in this case does not diminish the legislature's authority to adopt public policies that align with fundamental fairness.  Rather than simply meeting the bare minimum required by the federal constitution, perhaps the legislature will find the means to recognize the economic value of community service performed in *Blake* cases and authorize refunds corresponding to the value at the time of imposition.

With these observations, I respectfully dissent.

Yu, J.

No. 103627-2 (consolidated w/ 103673-6)

MUNGIA, J. (dissenting)—"LFOs create prisoners of debt."[1]

LFOs, or legal financial obligations, are court-imposed monetary sanctions assessed against criminal defendants for costs associated with convictions. RCW 9.94A.030(31). Courts may impose mandatory and discretionary LFOs. *Id.* Only in 2018 did our law change to prohibit courts from imposing discretionary costs on those unable to pay. ENGROSSED SECOND SUBSTITUTE H.B. 1783, 65th Leg., Reg. Sess. (Wash. 2018) (ESSHB 1783). LFOs imposed before this change are still subject to collection.

Prior to the passage of ESSHB 1783, Washington was one of the states with the highest LFO interest rates, at 12 percent. While the bill eliminated the 12 percent interest rate for nonrestitution LFOs, interest rates remain for restitution LFOs. RCW 10.01.160.

Interest is not the only way LFO debts grow. When an LFO payment is delinquent by as little as 30 days, Washington courts can contract with debt collection agencies

---

[1] ALEXES HARRIS, A POUND OF FLESH: MONETARY SANCTIONS AS PUNISHMENT FOR THE POOR 53 (2016).

(DCAs) to collect outstanding LFOs.  RCW 36.18.190.  If the outstanding LFO debt is less than $100,000, DCAs may impose an additional "collection fee" of up to 50 percent of the outstanding amount.  RCW 19.16.500.  They may impose a "collection fee" of 35 percent of unpaid debt over $100,000.  *Id.*  As one commentator has noted:

> The collateral consequences of LFO debt are demonstrably severe. Outstanding LFOs limit access to public and private housing, gainful employment, and damage credit, and they render debtors unable to establish bank accounts, obtain financial aid for educational or job training programs, and foreclose them from obtaining professional licenses.  Individuals with even one missed payment can have their driver's license revoked and are denied from accessing public benefits . . . .  LFO debtors with felony convictions cannot have their voting rights restored until their LFO debt is satisfied.

Bryan L. Adamson, *Debt Bondage: How Private Collection Agencies Keep the Formerly Incarcerated Tethered to the Criminal Justice System*, 15 Nw. J. L. & Soc. Pol'y 305, 309 (2020) (footnote omitted).  Consequences are severe for those with unpaid LFOs generally, and especially for those who cannot satisfy them quickly.  Debts continue to mount.  Access to assistance and rights are delayed.  A vicious cycle persists.

Courts also have the authority to punish people who fail to pay LFOs.  Courts may send them to jail, order them to perform work release, confine them to home detention, or order some other alternative confinement.  RCW 9.94A.6333(3)(a), .633(1)(a)-(b).  Courts cannot punish a person for failing to pay LFOs unless their failure to pay is

willful. RCW 9.94A.6333(3)(c). However, judges have broad discretion to determine when a defendant is unwilling but able to pay as opposed to being unable to pay.[2]

Additionally, in a study of Washington defendants' experiences with LFOs, Professor Alexes Harris found that for nonwillful debtors, whose inability to make payments is validated by the court, "legal debt carries additional hardship as they are regularly summoned to the court or arrested for outstanding warrants because of nonpayment." ALEXES HARRIS, A POUND OF FLESH: MONETARY SANCTIONS AS PUNISHMENT FOR THE POOR 53 (2016). In sum,

> in practice, an LFO is a form of punishment that levies an extra burden on poor defendants or people otherwise unable to pay it. People already saddled with chemical addiction, health limitations, and housing instability may be further burdened by the imposition of LFOs.
>
> Monetary sanctions jeopardize former defendants' ability to meet basic needs. Legal debt forces them to make hard choices about which bills to pay and which to let go unpaid.
>
> . . . [A]s the poor become ever more trapped in a cycle of poverty and debt fueled by the LFOs imposed by the criminal justice system, people with financial means are able to escape the burden of legal debt and at least begin to plot a path to successful reintegration and community reentry. The consequences of criminal justice contact are vastly different for them than for those who will carry legal debt for many years—or even the rest of their lives.

*Id.* at 52-53.

---

[2] *See* DAVID KEENAN, WASH. STATE SUP. CT. GENDER & JUST. COMM'N, 2021: HOW GENDER AND RACE AFFECT JUSTICE NOW 793 (citing Casey Jaywork, *Paying Your Debt to Society* (*with 12 Percent Interest*), SEATTLE WKLY. (June 8, 2016 1:30 AM) (quoting Professor Alexes Harris who said a judge inquiring into someone's resources might ask, "How much did you pay for your manicure? How much for cigarettes?"), https://www.seattleweekly.com/news/paying-your-debt-to-society-with-12-percent-interest), https://www.courts.wa.gov/subsite/gjc/documents/36_GJS_Chapter15.pdf.

Because of LFOs' serious consequences, the legislature also allowed defendants to petition the courts to remit all or part of their LFOs or modify the payment method. Former RCW 10.01.160(4) (1995). In 2018, the legislature modified the statute to explicitly state that courts can have a person satisfy their LFOs through community service. Former RCW 10.01.160(4) (2018). However, the statute did, and does, require the courts to find the defendant would suffer a "manifest hardship" if they were required to pay the LFO in cash. RCW 10.01.160(4). The only conceivable manifest hardship that would permit the court to accept community service in lieu of cash payments would be the inability to pay. Neither the State, the Court of Appeals, nor the majority identify any other plausible "manifest hardship."

The impacts of the 2018 amendments to RCW 10.01.160(3) reveal that courts used to impose LFOs on people who could not pay at the time. RCW 10.01.160(3) prohibits courts from imposing LFOs on indigent defendants. It also requires judges to consider a defendant's financial condition when they assess fines, whether or not they are indigent. However, before 2018, courts could impose LFOs on defendants who could not afford to pay, so long as a judge found they could pay in the future. Former RCW 10.01.160(3) (1995). These findings were largely up to the court's discretion. Judgment and sentences could also include boilerplate language that a person was, or would be, able to pay their LFOs, regardless of their actual ability to pay at the time. For example, Simone Nelson's judgment and sentences include this boilerplate language.

4

Ultimately, prior to the 2018 amendments, courts frequently imposed LFOs on people who could not afford to pay at the time of sentencing. Indeed, one judge in Clallam County stated that because "'90 percent of the folks we deal with'" are indigent defendants, he anticipated courts would lose major revenue from LFOs under the 2018 amendments to RCW 10.01.160(3). Paul Gottlieb, *Judge Halts Pay or Appear: New State Law To Impact Finances in Clallam, Jefferson Counties*, PENINSULA DAILY NEWS (Apr. 23, 2018). This context reveals why many who had LFOs imposed and had economic struggles were eventually permitted to perform community service in lieu of cash payments under RCW 10.01.160(4).

Whether a person petitions to perform community service in lieu of cash payments or a court allows it sua sponte, the reality is that people do not want to perform community service when they could pay with cash. Paying with cash allows people to escape mounting debt and its collateral consequences. The alternative is to spend hours of one's life laboring, oftentimes over the course of months or years, to pay off an unforgiving debt. Indeed, in the Washington State Supreme Court's Minority and Justice Commission's 2022 report on LFOs, judicial officers indicated that when they allow defendants to perform community service to satisfy LFOs, it is generally because of the defendants' inability to pay in cash. WASH. STATE SUP. CT. MINORITY & JUST. COMM'N,

THE PRICE OF JUSTICE: LEGAL FINANCIAL OBLIGATIONS IN WASHINGTON STATE (2022).[3]

Payment by community service is almost always out of necessity.

It is important to note that financial hardship is a fluid status. As the United States Supreme Court noted in *Bearden v. Georgia*, 461 U.S. 660, 666 n.8, 103 S. Ct. 2064, 76 L. Ed. 2d 221 (1983), "a defendant's level of financial resources is a point on a spectrum." While some may be able to pay part of their debts with cash, at other times they must resort to compulsory[4] service work to avoid missed payments.

Therefore, there are two classes of people who pay LFOs: those who can pay without financial hardship and do, and those who would suffer financial hardships if they were required to pay in cash. People who, because of their wealth status, could not fully pay their LFOs in cash should be treated the same as those who could because of their financial means.

Here, the courts violated Ms. Danielson's and Ms. Nelson's equal protection rights by treating them differently because they paid a portion of their LFOs through community service. Given the realities of the LFO system, I cannot agree with the majority's holding. Denying reimbursements for LFO debts satisfied through community service, while allowing reimbursement for those who paid with cash, is indeed wealth-

---

[3] *See*, *e.g.*, App. E, Question 30 (Prosecutors) (one respondent explained that "most adults would rather work and get paid and pay their [LFOs], than do community service instead of getting paid").

[4] I interchangeably use the term "compulsory" instead of "community" to emphasize the mandatory, restrictive nature of the work. If a person does not complete the service requirements, they will not be credited payment toward their LFO debts.

based discrimination. This is true especially in this case where there is ample evidence that Ms. Danielson and Ms. Nelson performed community service instead of paying cash because of financial hardship. Our state constitution prohibits discrimination based on wealth-status classifications unless the State can show a substantial governmental interest in treating these two classes differently. The State is unable to make that showing. The disparate treatment also does not survive rational basis review.

Accordingly, I respectfully dissent.

I
BACKGROUND

In the wake of *Blake*, courts across the state have been working to refund LFO payments made by those whose convictions were invalidated after RCW 69.50.4013, making simple possession of an illegal drug a crime, was held unconstitutional. *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021). The legislature established the *Blake* Refund Bureau to assist local governments obligated to refund those court fines. LAWS OF 2022, ch. 297, § 114(5)-(6); LAWS OF 2023, ch. 475, § 114(10)-(11); LAWS OF 2024, ch. 376, § 113(1). While courts have deemed that those who paid their LFOs with cash are entitled to a refund, this case poses the question of whether those who paid with community service, which was credited as money, are also entitled to a refund. Under our laws, the answer is yes.

Sabra Danielson and Simone Nelson were both convicted of simple drug possession.

7

Ms. Nelson pleaded guilty to strict liability, unlawful possession in Clallam County both in 1995 and in 1998. She was appointed a public defense attorney for each charge, meaning she was indigent at both times. RCW 10.101.020(1). In the judgment and sentence of her first plea, the court did not find she had the means to pay for the cost of incarceration. The court noted that most of her LFOs could be converted to compulsory service work hours. However, both her judgment and sentences include boilerplate language stating that the court found she has the ability or likely future ability to pay LFOs. This finding was legally necessary to impose LFOs, even if the judge did not actually inquire into her ability to pay. Altogether, the court imposed at least $2,677.90 in LFOs on Ms. Nelson.

In 1997, a court considered specific conduct by Ms. Nelson that could have violated the terms of her probation, including failure to pay her LFOs. Several years later, on March 7, 2003, the court placed Ms. Nelson in a "pay or appear" program. The program required her to make monthly payments or appear in court to explain why she could not make the payment. Failure to appear in court after a missed payment would result in a warrant for Ms. Nelson's arrest.

She was likely placed in the pay or appear program because she missed a payment on her LFOs. Clallam County's "pay or appear" program's founding judge has shared that "[a]nyone who does not pay a fine in full is put on the pay-or-appear program." Paul Gottlieb, *ACLU Gives Its View of Clallam County Pay-or-Appear Program*, PENINSULA

DAILY NEWS (June 3, 2016).[5]  The pay or appear program also includes a community

service option.  *Id.*

The first month Ms. Nelson was in the pay or appear program, she did not pay the

required monthly payment with cash.  Instead, she had to perform community service or

potentially face jail time for nonpayment.  On April 18, 2003, the court credited

Ms. Nelson with $280 as payment toward her LFOs for 80 hours of compulsory service

work she performed.  In 2007, the court again placed Ms. Nelson on "pay or appear"

status.  It took Ms. Nelson a decade to ultimately pay $1,910 in cash payments toward her

LFOs and, in addition, be credited $560 for compulsory service work hours.

In 2003, Sabra Danielson pleaded guilty to strict liability, unlawful possession in

Clallam County.  Ms. Danielson was appointed a public defense attorney.  Her judgment

and sentence also included boilerplate language finding she had the ability or likely

future ability to pay imposed LFOs.  Nevertheless, by agreement of the parties, the court

found Ms. Danielson indigent and waived $1,000 in costs.  The court also did not find

she had the means to pay for the cost of incarceration.  Altogether, the court imposed at

least $1,060 in LFOs.

---

[5] Another example of the pay or appear program in Benton County, Washington, reveals how court clerks informally negotiated pay or appear agreements with individuals immediately following their failure-to-pay fine hearing.  These agreements were often entered into without counsel and were proposed to nonpaying defendants as a way to avoid jail time.  Courts did not have to, nor did they necessarily, make inquiries into an individual's actual ability to make monthly payments to put them in this program.  "Payment plans are set according to the amount owed, not an individual's financial circumstances."  AM. C.L. UNION & COLUMBIA LEGAL SERVS., MODERN DAY DEBTORS' PRISONS: THE WAYS COURT-IMPOSED DEBTS PUNISH PEOPLE FOR BEING POOR 8-10 (Feb. 2014).

Ms. Danielson's obligation to begin paying her LFOs started when her judgment and sentence was entered in March 2003. She was required to perform 240 hours of community service to satisfy part of her sentence. It took over 2 years from the date of Ms. Danielson's judgment and sentence for her to be credited $110.98, for 15.5 hours of compulsory service work, toward her LFOs. On November 18, 2004, Ms. Danielson wrote a letter to the court, explaining that she could not complete her community service work hours between school, work, taking care of her children, and taking care of her father. These obligations imposed financial hardships. She feared going to jail for failing to make payments. The fact she did not pay with cash to avoid going to jail when she was unable to perform community service demonstrates her precarious economic situation. Ms. Danielson ultimately paid $520 in cash payments toward her LFOs and, in addition, was credited with $110.98 for compulsory service work hours.

Both Ms. Danielson and Ms. Nelson performed compulsory service work because the court ordered them to pay LFOs, allowed them to pay through their labor, and could place them in jail if they willfully failed to pay. The portions of their LFOs paid with community service were credited by the State as money at an hourly minimum wage rate. After their convictions were invalidated by *Blake*, both Ms. Danielson and Ms. Nelson sought to have the full value of their LFOs refunded to them, like those who paid their full LFO amounts with cash. The court denied their request.

Equal protection under both state and federal law requires the State to treat Ms. Danielson and Ms. Nelson the same as it has treated the *Blake* defendants who paid

10

their LFOs entirely with cash.  They are all part of the class of people who paid their LFO debts, one way or another, as allowed by the court, pursuant to invalid convictions.  To treat those who paid the monetary amounts with labor differently from those who paid with cash is discrimination based on wealth status and should not be allowed under the law.

II
MS. DANIELSON AND MS. NELSON ARE ENTITLED TO THE EQUAL PROTECTION OF THE LAW AND TO BE TREATED THE SAME AS THOSE WHO FULLY PAID THEIR LFOS WITH CASH

The equal protection clause of the Fourteenth Amendment guarantees that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  Washington State Constitution article I, section 12 also requires that "persons similarly situated with respect to the legitimate purpose of the law must receive like treatment."  *State v. Coria*, 120 Wn.2d 156, 169, 839 P.2d 890 (1992).  We have consistently held that the equal protections guaranteed by the Fourteenth Amendment and article I, section 12 are "substantially identical and subject to the same analysis." *State v. Osman*, 157 Wn.2d 474, 483 n.11, 139 P.3d 334 (2006).  Accordingly, Ms. Danielson's and Ms. Nelson's claims may be analyzed under both the federal and state laws.

State action denies equal protection of the law when it treats an identifiable class of people differently from similarly situated people, giving them benefits or burdens based on that classification without a sufficient state interest.  *Id.* at 484.  To determine

11

whether equal protection applies, we must first identify whether there was state action. *Id*. If there was, we next determine whether the state actor treated a person differently from someone similarly situated. *Id*. at 485. Finally, based on how or why that person was treated differently, we scrutinize the state action. *Id*.

The majority asserts it is unclear whether there is state action here. Majority at 10. The majority also claims Ms. Danielson and Ms. Nelson fail to show the disparate treatment was based on membership in a class. *Id*. at 8. Consequently, the majority declines to engage in any equal protection scrutiny. The majority is incorrect on each of these grounds.

1. The Trial Courts' Refusal To Fully Reimburse Ms. Danielson and Ms. Nelson for Their LFOs Is State Action Under the Equal Protection Clause

While equal protection challenges often involve legislative classifications, courts are also state actors that must comply with the constitutional guaranty of equal protection. *See Shelley v. Kraemer*, 334 U.S. 1, 14, 68 S. Ct. 836, 92 L. Ed. 1161 (1948) ("That the action of state courts and of judicial officers in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment, is a proposition which has long been established by decisions of this Court."). Several examples from our case law make this clear. In *Osman*, there was state action when the trial court denied a defendant's request for a sentencing alternative. 157 Wn.2d 474. In *State v. Swiger*, 159 Wn.2d 224, 149 P.3d 372 (2006), there was state action when the trial court entered a judgment and sentence that did not reflect the defendant's credit for time served during home detention. In *State v. Handley*, 115 Wn.2d 275, 289, 796 P.2d 1266 (1990), there

12

was state action when a trial court imposed an exceptional sentence on a defendant but sentenced the codefendant to a standard range.

Our precedent demonstrates that courts are state actors. Courts' decisions treating similarly situated people differently are subject to equal protection review.

Here, the courts imposed LFOs on Ms. Danielson and Ms. Nelson, authorized compulsory service work as payment, credited specific monetary values for their labor, then denied them reimbursement for those values. The courts' decisions to grant reimbursements for LFO amounts paid with cash, but not for amounts paid with labor, is state action.

2. Ms. Danielson and Ms. Nelson Were Treated Differently from People Similarly Situated Who Sought LFO Reimbursements Based on Invalidated Convictions

After finding state action, the next step is to determine whether the courts treated Ms. Danielson and Ms. Nelson differently from those similarly situated. *In re Pers. Restraint of Mota*, 114 Wn.2d 465, 788 P.2d 538 (1990). To analyze this, courts must address two questions: (1) whether they were similarly situated and (2) whether the courts treated them differently. Our holding in *Mota* helps answer these questions.

First, in *Mota*, we identified two groups of people who were similarly situated. *Id.* at 473. "Group A" included people convicted of felonies who spent time in pretrial detention. *Id.* "Group B" included people convicted of felonies who did not spend time in pretrial detention. *Id.* We held Groups A and B were similarly situated because they shared a similar status and similar interest, despite some differences. *Id.* They were

13

similarly situated in that both Groups A and B were convicted of felonies, had detention imposed, and spent time in detention. They had a similar interest in that both groups sought good-time credit for time spent in detention pursuant to the provisions at issue. *Id.* A main difference between the groups was how much credit they were entitled to under the provisions at issue.

Second, we held that these groups of similarly situated people were treated differently. *Id.* The provisions at issue did not account for time spent in pretrial detention when calculating good-time credit. As a result, people in Group B were granted good-time credit based on the entire time they spent in detention, but people in Group A were not. *Id.* We held that the good-time credit provisions led to disparate treatment between the groups in violation of the defendant's equal protection rights, which is discussed further below. *Id.* at 472.

Here, like in *Mota*, similarly situated people are being treated differently.

First, Ms. Danielson and Ms. Nelson are similarly situated to those who paid the entirety of their LFOs in cash. For the sake of this analysis, Ms. Danielson and Ms. Nelson are in Group A. Group A includes people who paid all or part of their LFOs with community service hours, which were credited as a monetary amount. Group B includes people who paid the full value of their LFOs with cash. Groups A and B are similarly situated in that both were convicted of felonies, had LFOs imposed, and paid their LFOs. They have a similar interest in that both groups seek reimbursement for their LFOs based on their invalid convictions. A main difference is how much LFO

14

reimbursement they are entitled to under the State's current practices. Therefore, both groups are part of the broader class of similarly situated people who seek reimbursement for LFOs paid pursuant to invalid convictions.

Second, Ms. Danielson and Ms. Nelson (Group A) were treated differently from those who fully paid their LFOs with cash (Group B). Although both Groups A and B paid their LFOs, only one group received full reimbursement. This is like how both groups in *Mota* served time in detention, but only one group received full credits for that time. Here, like in *Mota*, a state actor engaged in disparate treatment of similarly situated people. The trial courts denied reimbursements for LFO amounts paid with labor while allowing reimbursements for LFO amounts paid with cash.

With the state action and disparate treatment elements satisfied, the next inquiry is the applicable level of scrutiny. *Osman*, 157 Wn.2d at 484.

3. The State Action Is Subject to Equal Protection Review

Courts apply a tiered framework to evaluate the constitutionality of challenged state action under the equal protection clause. *Id*. The appropriate level of scrutiny depends on the class targeted and the rights affected. *Id.* Generally, there are three levels of scrutiny: strict scrutiny, intermediate ("heightened") scrutiny, and rational basis review. *Id*. Each is briefly described below.

a. Strict Scrutiny

The most stringent standard applies when state action targets a suspect classification (i.e., race or national origin) or impinges on a fundamental right (e.g., the

15

right to vote). *Id*. To survive strict scrutiny, the government must show that the discrimination is necessary to achieve a compelling state interest and that the measure is narrowly tailored to that interest. It is not implicated here.

### b. Intermediate Scrutiny

This is a heightened level of scrutiny that requires the State to prove its discriminatory action advances a substantial governmental interest. *Plyler v. John Doe*, 457 U.S. 202, 217-18, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982); *State v. Schaaf*, 109 Wn.2d 1, 17, 743 P.2d 240 (1987). Our state constitution "clearly establish[es]" the use of intermediate scrutiny in a broader array of cases where state action burdens both "an important right and a semi-suspect class not accountable for its status." *Schroeder v. Weighall*, 179 Wn.2d 566, 578, 316 P.3d 482 (2014);[6] *see also Martinez-Cuevas v. DeRuyter Bros. Dairy*, 196 Wn.2d 506, 527-28, 475 P.3d 164 (2020) (González, J., concurring) (collecting cases); *Plyler*, 457 U.S. at 213 ("The Equal Protection Clause was intended to work nothing less than the abolition of all caste-based and invidious class-based legislation."). We have consistently held that the denial of an important interest based on wealth status is subject to intermediate scrutiny. *See*, *e.g.*, *State v. Phelan*, 100 Wn.2d 508, 514, 671 P.2d 1212 (1983); *Mota*, 114 Wn.2d at 474. Ms. Danielson and

---

[6] Our case law varies on whether intermediate scrutiny applies when there is an important right, a semi-suspect class not accountable for its status, or both. *Compare Schroeder*, 179 Wn.2d at 578, *with State v. Osman*, 157 Wn.2d at 484. I assume, without deciding for purposes of this analysis, that intermediate scrutiny applies when there is both an important right and a semi-suspect class since both are established here.

16

Ms. Nelson contend the state action discriminates against them based on their wealth status.

c. Rational Basis Review

This is the lowest level of scrutiny. It applies when a law targeting a class of people does not involve a suspect or semi-suspect class or a fundamental right. *Am. Legion Post No. 149 v. Dep't of Health*, 164 Wn.2d 570, 604, 192 P.3d 306 (2008). Under rational basis review, the challenger has the burden of showing the state action is not rationally related to a legitimate governmental interest. *Id.* A classification that rests on grounds wholly irrelevant to legitimate state objectives will not be upheld. *Gossett v. Farmers Ins. Co. of Wash.*, 133 Wn.2d 954, 979, 948 P.2d 1264 (1997). However, courts can uphold state actions under rational basis review if any conceivable facts could provide a rational basis for the disparate treatment, even if it produces some inequality. *Am. Legion Post No. 149*, 164 Wn.2d at 610.

The majority errs by not applying any tier of scrutiny. If they did, they would at least need to analyze whether the State had a legitimate reason to treat Ms. Danielson and Ms. Nelson differently from those who paid the entirety of their LFOs with cash under rational basis review.

I believe the state action fails under intermediate scrutiny, and even under rational basis review, because it interferes with Ms. Danielson's and Ms. Nelson's important right to reimbursement based on their wealth status without proper justification.

17

III
THE STATE ACTION IS SUBJECT TO INTERMEDIATE SCRUTINY AND FAILS UNDER THAT
TEST

For equal protection analysis, courts must use the intermediate level of scrutiny for the contested state action if (1) the state action threatens an important right and (2) the person alleging the equal protection violation is a member of a suspect or a semi-suspect class. *Schroeder*, 179 Wn.2d at 578. Both bases for applying intermediate scrutiny are present here. First, Ms. Danielson and Ms. Nelson have an important right to reimbursement for the full value of their satisfied LFOs. Second, both Ms. Danielson and Ms. Nelson belong to the class of people whose lack of wealth prevented them from paying their LFOs fully with cash.

1. Ms. Danielson and Ms. Nelson Have the Right To Reimbursement for the Compulsory Community Service They Performed To Pay Their Legal Financial Obligations Imposed Under an Invalid Statute

Ms. Danielson and Ms. Nelson have the right to have the State reimburse them for the value of the compulsory community service they performed to pay their LFOs. Because the sole basis for the LFOs were invalid convictions, the State never had the right to impose LFOs in the first place. As such, Ms. Danielson and Ms. Nelson have an important right to be reimbursed for all that the State wrongfully took from them. This is the same right held by people who satisfied their LFO obligations through cash payments. This is also the same right underscored in the United States Supreme Court's decision, *Nelson v. Colorado*, 581 U.S. 128, 135-36, 137 S. Ct. 1249, 197 L. Ed. 2d 611 (2017). While *Nelson v. Colorado* is a due process case, its interest analysis provides a

18

framework for the important right to reimbursement for LFOs paid pursuant to an invalid conviction.

In *Nelson v. Colorado*, the Court held, based on its due process analysis, that the petitioners were entitled to "obtain the refund of costs, fees, and restitution paid pursuant to an invalid conviction" without needing to show their innocence. *Id.* at 134. The first step in a due process analysis is to evaluate the private interest affected. *Id.* at 135. The Court determined that the petitioners' "interest in regaining their funds" that the State took as financial obligations pursuant to their invalid convictions "is high." *Id.* at 135, 139. The petitioners' strong interest in regaining the value they paid to the State flowed from the fact that the State did not have a valid basis to impose the obligations. *Id.* at 135. The Court reasoned that "[t]he sole legal basis for these assessments was the fact of [the petitioners'] convictions. Absent those convictions, [the State] would have no legal right to exact and retain petitioners' funds." *Id.* at 131-32. The Court noted that the petitioners did not seek compensation for the temporary deprivation of the funds but, rather, restoration for what the State improperly took from them. *Id.* at 138 ("Just as the restoration of liberty on reversal of a conviction is not compensation, neither is the return of money taken by the State on account of the conviction.").

*Nelson v. Colorado* stands for the proposition that the state must reimburse people for LFO amounts improperly taken pursuant to an invalid conviction. People who paid, whether through cash or community service, have the right to be put in the same position as if they never had to pay at all. This right is an important one, as affirmed by the

United States Supreme Court.  The majority is incorrect to narrowly read the holding in *Nelson v. Colorado* to extend to property rights only for cash paid.  Majority at 6.

However, even under the majority's narrow reading, Ms. Danielson and Ms. Nelson still have the right to be reimbursed for the full amount of their satisfied LFOs, whether paid through cash or community service.  By statute and the courts' determinations in these cases, their community service hours were equivalent to money in this context.  First, RCW 9.94A.030(31) defines an LFO as a "sum of money."  LFO payments through different forms must have a monetary value to satisfy that sum.  Second, the court credited their service hours at a minimum wage rate and applied that dollar amount to satisfy the "sum of money ordered" for their LFOs.  In other words, the court credited Ms. Danielson's and Ms. Nelson's work as money, and they now seek reimbursement for that money that the State was never entitled to.

Because Ms. Danielson's and Ms. Nelson's labor was converted into a monetary value by the court, they, like the petitioners in *Nelson v. Colorado* and those who paid their LFOs with cash, have an important interest in being reimbursed for that amount wrongfully taken by the State.  Accordingly, intermediate scrutiny should apply if Ms. Danielson and Ms. Nelson can also show that the disparate treatment regarding this important interest was based on their wealth status.  As discussed below, they do.

2.  The Important Right to Reimbursement Is Threatened by Semi-Suspect Classifications of People Based on Their Inability To Pay LFOs in Cash

Ms. Danielson and Ms. Nelson argue the State discriminated against them based on their inability to satisfy their full LFO obligations with cash.  Under the majority's

20

holding, those who could afford to pay their LFOs with cash may be fully reimbursed, while those who could not are not entitled to full reimbursement. This should not be our law. The federal and state constitutions have long served as a safeguard against state practices that punish or burden individuals solely because of their wealth status.

In a series of Fourteenth Amendment decisions beginning in 1956, the United States Supreme Court recognized equal justice cannot depend on a person's financial needs. In *Griffin v. Illinois*, the court held that criminal defendants who cannot afford transcripts must be afforded as adequate appellate review as those who can. 351 U.S. 12, 19, 76 S. Ct. 585, 100 L. Ed. 891 (1956). In *Douglas v. California,* the Court recognized the equal protection clause prevents discrimination against criminal defendants who cannot afford to meaningfully exercise their rights, holding that those who cannot afford counsel must receive as adequate appellate review as those who can. 372 U.S. 353, 355, 358, 83 S. Ct. 814, 9 L. Ed. 2d 811 (1963).

In a later decision, the United States Supreme Court determined on equal protection grounds that a prison sentence cannot be extended so that a person who is unable to pay a fine in cash can work it off with additional imprisonment. *Williams v. Illinois*, 399 U.S. 235, 242, 90 S. Ct. 2018, 26 L. Ed. 2d 586 (1970). The court held that the law at issue in that case imprisoned people beyond the statutory maximum, and in practice, affected only people who were unable to pay in cash. *Id*. This court applied *Williams* and held that the State must provide time-served credits to people who could not afford bail. *Reanier v. Smith*, 83 Wn.2d 342, 351, 517 P.2d 949 (1974). Otherwise, the

21

law would result in imprisoning people beyond the maximum or mandatory minimum sentence, and in practice, this affected only people unable to afford bail. *Id.*

Most recently, the United States Supreme Court reinforced that wealth-status discrimination is subject to equal protection scrutiny in *Bearden*, 461 U.S. 660. There, a court decided to imprison a petitioner for his inability to pay costs imposed pursuant to his conviction. *Id*. at 662. The petitioner initially paid part of his balance within a few months, partially by borrowing money from his parents. *Id.* at 662-63. However, he was laid off from his job while he still owed payments. *Id.* He had a ninth-grade education and was unable to read, which prevented him from finding another job. *Id.* Although he notified the court he would be late on his payments, the court revoked his probation for his failure to pay. *Id.* at 663. It sentenced him to serve the remaining portion of his probation period in prison. *Id.*

In reviewing the trial court's decision, the United States Supreme Court noted that a defendant's level of financial resources is a point on a spectrum and that indigency is a relative term. *Id.* at 666 n.8. The Court found that "[d]ue process and equal protection principles converge" in analyzing this issue. *Id.* at 665. The issue under the equal protection clause was whether a defendant's indigent status may be considered in the decision to revoke probation. *Id.* at 666. The Court recognized that the equal protection question was "substantially similar" to the due process question surrounding the State's ability to revoke probation when an indigent person cannot pay a fine. *Id.* The Court ultimately held that it is fundamentally unfair and unconstitutional to automatically

revoke probation without considering alternatives if a defendant made all reasonable efforts to pay. *Id*. at 668-69. The Court recognized one such alternative is to order a defendant to do compulsory service work instead of paying cash. *Id.* at 672.

None of these United States Supreme Court cases explicitly used intermediate scrutiny to analyze wealth-status discrimination. However, our court has explicitly held that state action denying an important interest due to wealth status is subject to intermediate scrutiny. *Phelan*, 100 Wn.2d at 512-14 (citing *Plyer*, 457 U.S. at 223); *Mota*, 114 Wn.2d at 474. This is because people with limited financial means are not fully accountable for their status, so they make up a quasi-suspect class subject to heightened protection. *Id.* We have consistently found wealth-status discrimination when the disparate treatment is, in effect, based on wealth. This is so even if the basis is "'not explicitly limited' to the indigent or poor." *Compare* majority at 9 (quoting Wash. State Sup. Ct. oral arg., *State v. Danielson*, No. 103627-2 (June 12, 2025), at 11 min., 40 sec., https://tvw.org./video-washington-state-supreme-court-2025061150/), *with Reanier*, 83 Wn.2d at 349-50, *and Phelan*, 100 Wn.2d 508, *and Mota*, 114 Wn.2d 465, *and In re Pers. Restraint of Fogle*, 128 Wn.2d 56, 904 P.2d 722 (1995) (upholding *Mota* on this point).

In *Reanier*, we relied on the "sound and persuasive" reasoning in *Culp v. Bounds*, 325 F. Supp. 416, 419 (W.D.N.C. 1971), and concluded there was unconstitutional wealth-status discrimination when presentence jail time was not credited against the sentences of those petitioners. 83 Wn.2d at 349-50.

23

> "[T]he state's refusal to give Culp credit for pre-trial detention is an unconstitutional discrimination on the basis of wealth prohibited by the Fourteenth Amendment. As outlined above, wealthy defendants (except where no bail is allowed) are able to remain out of prison until conviction and sentencing; the poor stay behind bars. . . . Such a distinction, which, in effect, provides for differing treatment on the basis of wealth, is unconstitutional absent some 'compelling governmental interest.'"

*Id.* (quoting *Culp*, 325 F. Supp. at 419). While the standard of review for wealth-status discrimination has since changed,[7] it remains the law that we apply heightened scrutiny when the State denies an important right on the basis of wealth status.

Following *Reanier*, in *Mota*, we concluded that the Department of Corrections violated the equal protection clause when it failed to award earned early release time to those held in county jail prior to formal sentencing. *Mota*, 114 Wn.2d at 472. Under the 1981 version of the Sentencing Reform Act (SRA), an offender's sentence could be reduced by up to one-third based on good behavior. *Id.* at 470. Pretrial incarceration time was not included in the calculation. *Id.* The result was that offenders with no pretrial incarceration time received proportionately more good-time credit. "[O]ffenders who could not obtain pretrial release d[id] not get as much good time as offenders with identical sentences who could obtain pretrial release." *Id.*

While *Mota* involved a different important interest, its analysis of wealth-status discrimination is instructive here. Critically, in *Mota*, this court highlighted how the

---

[7] Now, the State needs to show a substantial governmental interest, not a compelling one, under intermediate scrutiny. *See Plyler*, 457 U.S. at 217-18; *State v. Schaaf*, 109 Wn.2d at 17.

difference between those who obtained pretrial release and those who did not was based on wealth status. *Id.* at 474. There was no requirement that those who were subject to bond had to pay it. We accepted that those who did not pay bond did so because they could not afford to pay. Implicit in that conclusion is that those who could pay their bond with cash did so instead of remaining in pretrial detention.

The majority's holding here that we cannot apply intermediate scrutiny based on wealth-status classification goes against our precedent. Majority at 8. In fact, its holding directly contradicts our analysis in *Fogle*, 128 Wn.2d 56. In *Fogle*, we applied intermediate scrutiny for wealth-status discrimination even though we noted the basis for the classification was not explicitly limited to the poor. *Id.* at 62-63.

> Without disturbing *Mota,* we note failure to pay set bail does not necessarily represent a wealth-based classification to merit semi-suspect status. The determination of bail may depend on many factors beyond wealth, such as perceived dangerousness and likelihood of flight. *See* CrR 3.2(b). Moreover, a prisoner may elect not to pay bail for reasons other than financial condition.

> In the present case there is some dispute whether Defendants were eligible for bail. . . . Nonetheless, we will construe the facts in the light most favorable to Defendants and proceed on an intermediate scrutiny standard.

*Id.* at 63. Justice Alexander's dissent in that case, joined by Justices Madsen, Johnson, and Pekelis, affirmed that "because the central issue in the case concerns an alleged

denial of a liberty interest based on wealth, a semi-suspect classification, the appropriate

standard of review . . . is intermediate scrutiny." *Id.* at 70-71.[8]

The court's analysis in *Fogle* is directly on point here. Although the majority

asserts there may be different reasons one pays their LFOs with community service

instead of cash, the disparate treatment is still, in effect, based on wealth status.

Ms. Danielson and Ms. Nelson are not asking this court to hold there is an equal

protection violation based on an "assumption." Majority at 9. As discussed above,

paying cash presented a manifest hardship for Ms. Danielson and Ms. Nelson and there is

significant evidence showing they performed compulsory service work because they

lacked the ability to pay.

The majority's demand for explicit proof of indigency at the time of the

compulsory service work ignores both the procedural context and reasonable inferences

from the record. In *State v. Blazina*, we held that pursuant to former RCW 10.01.160(3)

(1995), a sentencing judge must make an on-the-record individualized inquiry into a

convicted person's current and future ability to pay before imposing LFOs. 182 Wn.2d

---

[8] Justice Alexander also noted, in support of applying intermediate scrutiny based on wealth-status discrimination:

> The majority suggests that a person's failure to post bail may not always be driven by financial reasons. While in a theoretical sense that may be true, in a practical sense it is still a fact of life that most persons charged with a crime who have the wherewithal to post bail will do so. In this case, moreover, the Petitioners said that they would have posted bail had they been able to do so.

*Fogle*, 128 Wn.2d at 71 (Alexander, J., dissenting).

827, 838, 344 P.3d 680 (2015) (holding court must do more than sign a judgment and sentence with boilerplate language stating that it engaged in the required inquiry). However, Ms. Danielson's and Ms. Nelson's convictions predated *Blazina*. Their judgment and sentences contain boilerplate language stating that they had a current and future ability to pay. However, there is no record that the courts made the now mandatory, individualized inquiry into their actual ability to pay.

The State should not benefit from its failure to create an adequate record, and the majority should abandon the flawed assumption that performing compulsory service work was a choice. Whether labeled a "manifest hardship" or "indigency," the disparity is based entirely on economic status: a class of people did labor because they could not pay cash and are now not being reimbursed.

In sum, while the majority contends there is not a wealth-based classification here because the basis for the status is "'not explicitly limited' to the indigent or poor," our case law and the facts show otherwise. Majority at 9 (quoting Wash. Sup. Ct. oral arg., *supra*, at 11 min., 40 sec.). Like we did in *Fogle*, we should apply intermediate scrutiny based on wealth-status classification.

3. Refusing To Reimburse LFOs Paid Via Compulsory Service Work Does Not Advance an Important Governmental Interest

Under intermediate scrutiny, the State must establish its discriminatory treatment advances a substantial governmental interest. *Schaaf*, 109 Wn.2d at 17. The State fails to establish that refusing to reimburse Ms. Danielson and Ms. Nelson advances a substantial governmental interest. Instead, the State argues Ms. Danielson and

27

Ms. Nelson do not have a common law right to reimbursement for the value of their compulsory community service. The State also argues that the legislature did not expressly authorize reimbursement for service work. The fact that there is no legislatively approved mechanism for specifically refunding compulsory service work is not a justification for unequal treatment; absence of legislative action is not an important interest. Notably, the courts already applied state minimum wage laws when converting the compulsory service work to LFO monetary payments. Ms. Danielson and Ms. Nelson are entitled to a refund of what the courts have already determined was the value of their labor in dollar terms.

To allow reimbursement only for cash paid, while denying reimbursement for labor performed, creates an irrational and punitive distinction between individuals based primarily on their financial means. Denying reimbursement under these circumstances disproportionately imposes a wealth-status-based penalty on people who were unable to pay their LFOs in cash. It reinforces and perpetuates systemic inequality by conditioning redress for invalid convictions on a person's ability to pay cash. Such an outcome violates equal protection principles. The state action does not survive intermediate scrutiny.

> 4. Under Rational Basis Review, the State Does Not Have a Legitimate Reason To Discriminate Between a Person's Methods of Satisfying Their LFOs

In addition to failing under intermediate scrutiny, the state action here cannot even survive rational basis review. *Id.* at 21.

The equal protection clause prohibits the government from treating similarly situated people differently without a legitimate governmental interest. *Id.* at 21-22. Even under the most deferential rational basis standard of review, there must be some conceivable set of facts where the disparate treatment is rationally related to a legitimate government interest. *Id.* We have held that the preservation of state funds is not a legitimate state objective that survives rational basis review. *Willoughby v. Dep't of Lab. & Indus.*, 147 Wn.2d 725, 741, 57 P.3d 611 (2002), *overruled in part on other grounds by Chong Yim v. City of Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019). Here, there is no legitimate reason to treat these groups differently aside from preserving state funds.

The State asks us to follow the rationale of the Court of Appeals in this case and hold that there is an alternative basis to deny reimbursement beside preservation of state funds.

> But it is not mere solvency that justifies the State action here: limiting refunds to payments actually made to the State is a legitimate State interest because the State has benefited from the monetary payment made to the State. Conversely, the State derived no benefit from any community service performed in lieu of paying LFOs. From a commonsense standpoint, the State has a reasonable interest in only reimbursing LFOs it actually received; community service work performed in lieu of LFOs did not directly benefit the State, nor is community service in lieu of paying LFOs as easily quantifiable as Nelson suggests. Thus, the trial court's action survives rational basis review, and Nelson's equal protection claim fails.

*State v. Nelson*, 32 Wn. App. 2d 679, 695, 558 P.3d 197 (2024). However, these arguments fail for several reasons.

29

First, while the State may want to reimburse only LFO payments it received in cash, this is not a "legitimate government interest." A legitimate government interest exists "so long as there is a plausible policy reason for the classification." *Nordlinger v. Hahn*, 505 U.S. 1, 11, 112 S. Ct. 2326, 120 L. Ed. 2d 1 (1992); *see also State v. Manussier*, 129 Wn.2d 652, 673, 921 P.2d 473 (1996) (discussing how the low bar to surviving rational basis scrutiny is rooted in our deference to legislative policy). In cases where court action, not legislative action, has been subject to rational basis review, we look to see whether the court's disparate treatment advances a legislative purpose or policy goal. *See Osman*, 157 Wn.2d at 486.

Here, there is no conceivable policy purpose served by refunding only payments the State received in cash. We uphold state actions rationally related to the legislature's policy objectives, such as promoting health, safety, or maintaining separation of powers, to name a few. *See, e.g.*, *id.* at 487; *Manussier*, 129 Wn.2d at 674; *Am. Legion Post No. 149*, 164 Wn.2d at 611. However, here, conserving state funds is the only conceivable state interest behind limiting these reimbursements. We have already established this does not survive rational basis review. *Willoughby*, 147 Wn.2d at 741.

Second, the Court of Appeals reasoned that a rational basis exists to deny reimbursement here because the State did not benefit from Ms. Danielson's and Ms. Nelson's compulsory service work. *Nelson*, 32 Wn. App. 2d at 698-99. However, whether the State benefited from the payments has nothing to do with whether there is a legitimate state interest. The Court of Appeals does not explain how its benefits analysis

30

is relevant to rational basis review. As the Court of Appeals itself acknowledges, Ms. Danielson and Ms. Nelson do not contend that their right to reimbursement is rooted in an unjust enrichment theory, which would require them to show the State received a benefit. *Id.* at 699. Instead, as seen in *Nelson v. Colorado*, this case is about putting the parties in the position they were in as if the LFOs had never been imposed—the State never had a right to require these payments. 581 U.S. at 131-32.

In other words, this case is more akin to a void contract case than an unjust enrichment one. When a contract is void, the parties are to be put in the same position they were in if the contract was never made. *See Willener v. Sweeting*, 107 Wn.2d 388, 397, 730 P.2d 45 (1986). Here, because the conviction is invalid, or void, the petitioners should be put in the same position as if the LFOs were never imposed. This means that they are entitled to be reimbursed for the full value of their LFO payments wrongfully taken by the State—just like the petitioners in *Nelson v. Colorado* and others in their situation who fully satisfied their LFOs with cash.

For all these reasons, there is no legitimate basis to deem that those who paid a debt through labor are less entitled to reimbursement than those who paid the same debt with cash. *Cf. Morris v. Blaker*, 118 Wn.2d 133, 149-50, 821 P.2d 482 (1992) (invalidating provisions of an act that gave firearm restoration rights to former felons but not to former mental patients because "[n]o plausible justification exists to explain why those who have been convicted of violent crimes should be deemed capable of

rehabilitation, but those who were previously involuntarily committed for treatment of a mental disorder are not").

The State also focuses so heavily on arbitrary distinctions between Ms. Danielson and Ms. Nelson paying with compulsory service work instead of cash that it loses sight of the central issue—Ms. Danielson and Ms. Nelson are entitled to LFO reimbursement based on their invalidated conviction, just like those who paid with cash. Our precedent shows that even if some distinctions can be drawn between those in a similar situation, that alone is not enough to survive rational basis review for differential treatment.

In *State v. Anderson*, 132 Wn.2d 203, 212-13, 937 P.2d 581 (1997), we determined there was no rational basis to treat defendants under pretrial electronic detention differently from those under posttrial electronic detention. We held that the condition of being subject to, and serving time in, home detention was identical for each group, even though the status of the groups differed in some ways. *Id*. We concluded that it was unconstitutional to grant jail credit to one group but not the other based on a distinction not rationally related to their shared condition. *Id*.

Other cases underscore the same principle—it is not rational to discriminate against people based on how they became part of a class when, regardless of how they got there, they are similarly situated. *See, e.g.*, *In re Pers. Restraint of Knapp*, 102 Wn.2d 466, 473-74, 687 P.2d 1145 (1984); *Reanier*, 83 Wn.2d at 351 ("We can see no practical, realistic or substantive difference between time spent in pretrial detention for want of bail and time spent in detention pending an appeal of a conviction or time spent

32

under a subsequently vacated and reinstated sentence.  It is all time spent in

confinement."); *Swiger*, 159 Wn.2d 224.

For example, in *Knapp*, we identified two groups: (1) people initially sent to

prison and then sent to a state hospital for treatment and (2) those initially sent to a state

hospital for treatment as a "sexual psychopath or as a condition of probation" and then

sent to prison.  102 Wn.2d at 473-44.  We held there was no rational basis for the

legislature to grant credit for time spent in "treatment" for persons initially sent to prison,

but not for those initially sent to a state hospital for treatment.  The State did not address

the dissimilar treatment of these people, and we concluded,

> Both groups are sent to the hospital for "treatment" and not "punishment"
> yet the former group receives full sentence credit for their hospital time
> while the latter group, under the State's analysis, would be denied the same
> credit.  There is no logical reason for distinguishing between persons who
> are transferred to mental health facilities after confinement in prison and
> persons originally sent to mental health facilities by the sentencing court
> prior to confinement in prison.

*Id.*  Both groups met the requirement for receiving treatment, so both groups should have

been equally credited for their treatment time.  There was no rational basis for treating

them differently based on how they arrived at that treatment.  *Id.* at 474 ("If the

Legislature recognizes that one member of the class should receive credit the equal

protection clause mandates that all members should receive credit.").

Applying those same principles here, there is no rational basis to treat similarly

situated members of this class differently based on how they became part of the class.

We have recognized that all people with invalid convictions pursuant to *Blake* are entitled

33

to LFO reimbursements. Ms. Danielson's and Ms. Nelson's method of satisfying their LFO debts does not change the fact that they are part of the broader class of similarly situated people who satisfied their LFOs through some form of payment. Such an arbitrary distinction between the methods of satisfying the LFOs does not support any reasonable bases to treat these similarly situated LFO payers differently. Ms. Danielson and Ms. Nelson must be treated similarly to others in the broader class, regardless of how they got there. Absent any reasonable basis for treating similarly situated people differently based on their method of payment, the state action cannot survive even rational basis scrutiny.

The State contends its discrimination will lead to more workable and equitable results, while promoting predictability and the continued use of compulsory service work to satisfy LFOs. This contention also does not survive deferential review. Here, a court already credited compulsory service work as a defined amount of money, based on the minimum wage at the time, so reimbursing LFOs satisfied through compulsory service work in this case is certainly workable and equitable. Moreover, it is hard to understand how denying reimbursements to all people with invalid convictions who paid their LFOs through labor produces an equitable result. The decision to refund LFOs has no bearing on the predictability and continued use of compulsory service work.

Moreover, even if there was some legitimate goal behind the disparate treatment, which there is not, the action still fails rational basis review. There must still be a rational relationship between the goal and the classification. *DeYoung v. Providence*

*Med. Ctr.*, 136 Wn.2d 136, 149, 960 P.2d 919 (1998). Here, the relationship of the classification to any conceivable goal would be "too attenuated" so as to render it arbitrary or irrational. *Id.*

In *DeYoung*, this court held that an eight-year statute of repose for medical malpractice claims arbitrarily distinguished between people who discovered their claims within the time period and those who did not. *Id.* at 149-50. The statute did not survive rational basis review.[9] *Id.* We acknowledged that "the Legislature could rationally speculate that protection of the medical malpractice insurance industry was needed to alleviate or avert a malpractice insurance crisis." *Id.* at 148. However, this legitimate goal was not enough for the statute to survive rational basis scrutiny because the classification was "too attenuated" to be rationally related to the State's goal. *Id.* at 149. We held "an eight-year repose provision could not rationally be thought to have any chance of actuarially stabilizing the insurance industry." *Id.* at 148.

Then, we acknowledged a second potential rational basis for the law: that barring stale claims by setting an outer limit to operation of the discovery rule was a legitimate goal since compelling a defendant to answer a stale claim is a "substantial wrong." *Id.* at 149-50. However, we held that justification also did not satisfy rational basis review

_____

[9] We held that the statute violated the privileges and immunities clause of our state constitution. However, we reiterated that while there are differences in the federal equal protection clause and the state privileges and immunities clause, "these differences do not require an independent state analysis; 'this court has repeatedly found these provisions substantially similar and treated them accordingly.'" *DeYoung*, 136 Wn.2d 136 at 142 (quoting *Seeley v. State*, 132 Wn.2d 776, 788, 940 P.2d 604 (1997)).

because "the miniscule number of claims subject to the repose provision renders the relationship of the classification too attenuated to that goal." *Id.* at 150.

*DeYoung* highlights that although rational basis review sets a low bar, the bar must still be cleared. The government cannot survive rational basis review merely because one can conceive of some legitimate goal motivating the disparate treatment. Rather, the classification must also be connected enough to that goal so as not to render their relationship arbitrary or irrational.

Applying this standard, the disparate treatment in this case between those who paid their LFOs with cash versus those who paid with compulsory service work does not withstand rational basis review. There are only a limited number of claimants in Ms. Danielson's and Ms. Nelson's position—those with invalidated convictions following *Blake* who paid LFOs through community service credited as a dollar amount. Denying reimbursement for those who paid in community service, but allowing reimbursement for those who paid in cash, is not rationally related to any legitimate state interest. The majority does not show otherwise. Therefore, we must hold Ms. Danielson's and Ms. Nelson's equal protection rights were violated.

IV
CONCLUSION

There is an ever-widening divide in this country between the haves and the have-nots. Those with means are able to pay their monthly mortgages (if they have a mortgage at all), buy groceries without scrutinizing the price of each item, pay for an attorney if they find themselves in the legal system, and, of course, pay any LFOs.

It is a different story for people who do not have.

Life is precarious. Dollars scarce. There is often the tradeoff between having enough food and making the rent payment. Trading off health needs to pay for electricity. Watching their kids grow up without anything, while watching how other parents can give their kids everything.

People without pay LFOs with their labor. Even if they have some cash to pay some of their LFOs, it is because of their wealth status, or more accurately, lack of wealth status, that they pay the remainder with compulsory community service—just like Ms. Danielson and Ms. Nelson did here.

The majority turns a blind eye to the reality of life. The reality is that those who can pay with cash, pay their LFOs in cash. The reality is that those who cannot pay off their LFOs in cash, pay with compulsory community service.

The majority's opinion rests on the argument that there may be people who have cash, but for whatever reason, they choose to pay with compulsory community service. We rejected that argument in *Mota*, where we recognized that an intermediate level of scrutiny had to be applied where the State deprived the defendants of an important interest "due to indigency." 114 Wn.2d at 474. We recognized the law made a wealth-based classification when it treated people differently who did not pay bail and thus were confined to jail awaiting trial. We applied intermediate scrutiny, even though we later acknowledged that that class included defendants who were denied bail and also included

37

some people who may have had the means to pay bail but chose to be in jail instead. *Fogle*, 128 Wn.2d at 63.

In short, we have never held that a wealth-based classification must have such rigid boundaries. The "indigent" class might encompass people with means who would opt to be in jail or, in this case, perform compulsory community service instead of paying the LFO obligation in cash. Instead, our equal protection holdings prior to this case have recognized the realities of life: those with wealth pay, those without stay in jail or perform compulsory community service.

The people who do not have should be treated the same as people who have.

Accordingly, I respectfully dissent.

_____
Mungia, J.

_____
González, J.

_____
Montoya-Lewis, J.